# United States Court of Appeals

## For the First Circuit

No. 17-1432

UNITED STATES,

Appellee,

v.

IDALIA MALDONADO-PEÑA,

Defendant, Appellant.

No. 17-1551

UNITED STATES,

Appellee,

v.

JUAN RIVERA-GEORGE, a/k/a TIO,

Defendant, Appellant.

No. 17-1681

UNITED STATES,

Appellee,

v.

SUANETTE RAMOS-GONZALEZ, a/k/a SUEI, a/k/a SUANETTE GONZALEZ-
RAMOS,

Defendant, Appellant.

No. 18-1184

UNITED STATES,

Appellee,

v.

CARLOS RIVERA-ALEJANDRO,

Defendant, Appellant.

_____

No. 18-1496

UNITED STATES,

Appellee,

v.

JOEL RIVERA-ALEJANDRO, a/k/a "J",

Defendant, Appellant.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Carmen Consuelo Cerezo, U.S. District Judge]

_____

Before

Lynch, Thompson, and Kayatta,
Circuit Judges.

_____

Mariángela Tirado-Vales for appellant Idalia Maldonado-Peña.
José R. Olmo-Rodriguez for appellant Juan Rivera-George.
Raymond L. Sanchez Maceira for appellant Suanette Ramos-
Gonzalez.
Rachel Brill for appellant Carlos Rivera-Alejandro.
Rafael F. Castro Lang for appellant Joel Rivera-Alejandro.
Daniel N. Lerman, United States Department of Justice,
Criminal Division, Appellate Section, with whom W. Stephen
Muldrow, United States Attorney, Mariana Bauza, Assistant United

States Attorney, <u>Brian A. Benczkowski</u>, Assistant Attorney General, and <u>John P. Cronan</u>, Principal Deputy Assistant Attorney General, were on brief, for appellee.

_____

June 30, 2021

_____

**THOMPSON, <u>Circuit Judge</u>.**

**OVERVIEW**

These appeals arise from the drug conspiracy and distribution convictions of five members of a vast drug trafficking organization. Operating primarily out of the Los Claveles Housing Project ("Los Claveles") and the general Villa Margarita Ward area within the Municipality of Trujillo Alto, Puerto Rico, fifty-five individuals were indicted on charges of conspiracy to distribute heroin, cocaine, cocaine base (aka crack), marijuana, and prescription pills between May 2006 and May 2009. The indictment tagged each of the defendants before us with at least one role in the conspiracy; hierarchical designations ranging from leader, supervisor, drug owner, enforcer, runner, seller, or facilitator. Subsets of the fifty-five were charged with "aiding and abetting in the distribution of" one or more of heroin, cocaine base, cocaine, or marijuana. Some were also charged with conspiracy "to possess firearms in furtherance of drug trafficking crimes."

By the time a jury trial started in the summer of 2014 -- more than five years after the 2009 indictment (which certainly raises our eyebrows) -- most of the defendants had pled guilty. Four of them testified as cooperating witnesses ("CWs") for the government. At the end of the trial in December 2015 only eight defendants remained. The jury acquitted one defendant of all

charges and convicted the other seven of some or all of the charges against them.

Five of these defendants -- Joel Rivera-Alejandro, Carlos Rivera-Alejandro, Juan Rivera-George, Suanette Ramos-Gonzalez, and Idalia Maldonado-Peña -- have appealed their convictions (and some their sentences) and we briefly introduce them to you.

- Joel[1] was charged as one of the two leaders of the conspiracy as well as an enforcer. He was convicted of two conspiracy charges and all substantive drug charges, and sentenced to 360 months' imprisonment, concurrent.
- Carlos (Joel's brother) was identified as a supervisor, drug owner, seller, and enforcer. He was convicted on all counts against him and sentenced to 324 months' imprisonment, concurrent.
- Juan was tagged as a runner for the conspiracy, convicted on all counts, and sentenced to 235 months' imprisonment, concurrent.
- Suanette was charged for her roles as a seller and a facilitator and convicted of the drug conspiracy charge as well as the substantive marijuana distribution charge. Suanette was sentenced to 24 months' imprisonment, concurrent.
- Idalia (Carlos's wife) was identified in the indictment as a seller and convicted on the cocaine base distribution charge. Idalia was sentenced to 60 months' imprisonment.

The five defendants in these consolidated appeals raise a variety of challenges. In our review of their claims, we will

---

[1] We have used the defendants' first names throughout this opinion because two of them (brothers) share the same last name and a third has a similar surname. We intend no disrespect to the defendants by using their first names and we only use them to make it clear as to whom we are referring as we work our way through their arguments before us.

start by addressing the speedy trial contentions before turning to other purported trial errors.  We'll provide the background information necessary to place the issues and arguments in context as we proceed.[2]  For those readers for whom what follows will be tl;dr,[3] the short version is that none of the issues raised by these five defendants translate into reversible error warranting vacatur of their convictions or sentences.  Thus, we affirm the whole kit and caboodle.

---

[2] A quick aside about our presentation of the testimony and evidence at trial as we trudge through the issues.  Only Juan and Suanette challenge the sufficiency of the evidence to support their convictions, and we don't address those issues until after we have worked through others, including challenges to several evidentiary decisions made during trial.  Our presentation of the facts will be in a neutral, "balanced fashion," except where otherwise specified, especially because "the precise manner in which we chronicle the backstory has no impact on our decision." United States v. Zimny, 846 F.3d 458, 460 n.2 (1st Cir. 2017) (citing United States v. Vázquez-Larrauri, 778 F.3d 276, 280 (1st Cir. 2015), and United States v. Rodríguez-Soler, 773 F.3d 289, 290 (1st Cir. 2014)).  When we reach Juan's and Suanette's sufficiency-of-the-evidence arguments, we'll recite "our summary of the facts in the light most favorable to the jury's verdict." United States v. Chan, 981 F.3d 39, 45 (1st Cir. 2020) (citing United States v. Charriez-Rolón, 923 F.3d 45, 47 (1st Cir. 2019)).

[3] If "tl;dr" isn't familiar, it stands for "Too Long; Didn't Read" which, as defined by Urban Dictionary, is "used by someone who wrote a large post[]/article/whatever to show a brief summary of their post as it might be too long." https://www.urbandictionary.com/define.php?term=tl%3Bdr, last visited June 28, 2021.

## SPEEDY TRIAL

### The defendants waited five years for trial
(Joel & Carlos)

"[T]he right to a speedy and public trial" is guaranteed to criminal defendants via the Sixth Amendment. United States v. Lara, 970 F.3d 68, 80 (1st Cir. 2020) (quoting U.S. Const. amend. VI). Therefore, criminal charges must be dismissed when the government violates this right. Id. (quoting United States v. Dowdell, 595 F.3d 50, 60 (1st Cir. 2010)). Joel and Carlos claim that their constitutional right to a speedy trial was violated because, after they were arrested and arraigned in mid-2009, the trial (which took 128 days to complete) didn't start until five years later.[4]

Below, the defendants voiced speedy trial complaints during the pretrial period. In April 2013, Joel filed a motion to dismiss his indictment alleging his constitutional right to a speedy trial had been violated. Carlos joined the motion. The magistrate judge to whom the motion was referred issued a Report and Recommendation ("R&R") in July 2013. The magistrate judge found the trial date had either been vacated or rescheduled eight times and attributed much of the delay to change of plea motions

---

[4] There was some mention of the Speedy Trial Act during the trial phase and Juan provides one paragraph summarizing the statute in his brief but, on appeal, the defendants' arguments focus exclusively on the constitutional rather than the statutory right to a speedy trial.

filed by forty of Joel's codefendants. He also cited the numerous pretrial motions Joel filed requesting new counsel which resulted in continuation motions so that each new counsel (three in all) could get up to speed. The magistrate judge also determined Joel had not shown prejudice from the delay and recommended the district court deny the motion to dismiss.

Joel objected to the R&R (and Carlos adopted that objection), focusing on the failure of the R&R to discuss the numerous pretrial motions the government had filed up to that point which had contributed to the delay of the trial's start date. According to Joel, in the four years between his indictment and his speedy trial motion to dismiss, he had filed 4 continuation motions whereas the government had filed 22 motions to either continue the trial date or extend the time to respond to a pending motion. Joel further argued the length of the delay was presumptively prejudicial as per our case law and the magistrate judge should not have required him to show the ways in which he'd been prejudiced. Responding to the objection, the trial judge entered a one-paragraph order agreeing with the R&R and concluding there had been no speedy trial violation.

On appeal, Joel and Carlos reprise their complaints.[5] We have consistently reviewed a district court's resolution of a

---

[5] Below, Juan and Suanette joined Joel's motion to dismiss for violation of their constitutional speedy trial rights, but

defendant's motion to dismiss his indictment on the basis of a Sixth Amendment violation of his right to a speedy trial for abuse of discretion.[6]  Lara, 970 F.3d at 80.  When we evaluate such a challenge, we consider, primarily, four factors as set forth in Barker v. Wingo, 407 U.S. 514, 530-32 (1972):  "(1) 'the length of delay'; (2) 'the reason assigned by the government for the delay'; (3) 'the defendant's responsibility to assert his right'; and (4) 'prejudice to the defendant, particularly to limit the possibility that the defense will be impaired.'"  Lara, 970 F.3d at 80 (quoting United States v. Handa, 892 F.3d 95, 101 (1st Cir. 2018)).  However, "none of the four factors" is "either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial.  Rather, they are related factors and must be considered together with such other circumstances as may be relevant."  Barker, 407 U.S. at 533.  Further, our case law tells

---

neither filed an objection to the R&R nor indicated he or she joined in Joel's objection.  The R&R explicitly put them on notice that the failure to object within 14 days of the R&R would waive their right to appellate review.  Therefore, despite Juan's cursory arguments here about this issue and Suanette's attempt to join the arguments on appeal, they have waived this issue.  See United States v. Díaz-Rosado, 857 F.3d 89, 94 (1st Cir. 2017).

[6] As we have mentioned in other opinions addressing a speedy trial violation argument, there is some debate about whether the abuse of discretion standard is the appropriate standard of review for this issue, but for various reasons it is the standard we have consistently applied.  See Lara, 970 F.3d at 80; United States v. Irizarry-Colón, 848 F.3d 61, 68 (1st Cir. 2017).  Here, the parties agree our review is governed by this standard, so we proceed with it once again.

us to presume delays of one year or more are prejudicial and to proceed with an analysis that "balance[s] all four of the factors to determine whether there has been a violation, as [no one factor] carries 'any talismanic power.'" Lara, 970 F.3d at 81 (quoting Dowdell, 595 F.3d at 60).[7] Additionally, the Supreme Court has been clear that the inquiry into the four factors is completely dependent on the circumstances of each individual case. See Barker, 407 U.S. at 530-31. Joel and Carlos argue all four Barker factors weigh in their favor. We turn now to examine them.

Everyone agrees that the first factor -- length of delay -- weighs in Joel's and Carlos's favor. There is no doubt that the time between the defendants' May 2009 indictments and the July 28, 2014 trial start date was more than one year.[8]

The second factor -- reasons for the delay -- is the "focal inquiry." Lara, 970 F.3d at 82 (quoting United States v. Souza, 749 F.3d 74, 82 (1st Cir. 2014)). Joel, joined by Carlos, and the government are quick to point fingers at each other. Both

---

[7] A quick aside: Joel also tries to bring in the length of time that passed between the jury's verdict and his sentencing hearing. However, the Supreme Court has clearly stated the Sixth Amendment's guarantee to a speedy trial does not "apply to the sentencing phase of a criminal prosecution[.]" Betterman v. Montana, 136 S. Ct. 1609, 1612 (2016) ("[O]nce a defendant has been found guilty at trial or has pleaded guilty to criminal charges[,]" the guarantee doesn't apply).

[8] "The length of pretrial delay is calculated from either arrest or indictment, whichever occurs first." United States v. Casas, 425 F.3d 23, 33 (1st Cir. 2005).

defendants argue the root of the delay was the government's decision to indict and prosecute fifty-five defendants at the same time, exacerbated by the government's many motions to continue the trial date. According to Joel and Carlos, the delay was made more egregious by the trial judge's decision to wait to begin the trial until all the other defendants seeking to change their plea had done so, as well as the length of time she took to resolve pretrial motions such as Joel's motions to suppress. In particular, Carlos points out that defendants shouldn't have to choose between filing pretrial motions and getting to trial faster. The government argues the defendants principally caused the delays because of their numerous pretrial motions -- specifically, that the four defendants who bring speedy-trial claims (Joel, Carlos, Suanette, and Juan) filed ninety-nine pretrial motions -- and further say Joel's repeated change of counsel contributed to the delay.

When it comes to the reasons for delays, "different weights should be assigned to [the] different reasons" the government points to as justification for the delays. Barker, 407 U.S. at 531. In Lara, we held this factor weighed against the defendants there because their pretrial motions and those of other codefendants were the primary reason for the delays, not government foot-dragging. 970 F.3d at 82. In United States v. Casas, we noted the government had a legitimate reason for the five-and-a-half-year delay between the return of the indictment and the

arraignment: the government's inability to find the defendant. 356 F.3d 104, 112-13 (1st Cir. 2004). Here, unlike these prior cases, the five-year wait for trial was clearly caused by the numerous motions of all stripes filed by both the government and the defendants, including motions to suppress, discovery-related motions, change of plea motions, motions to continue the trial date, etc. Also contributing to the delay was the court's need on several occasions to continue the proceedings to attend to change-of-plea hearings from the other forty-seven indicted conspiracy members. Accordingly, it is difficult to draw a line and attribute trial delay to either the government or the defendants because they both substantially contributed to it.

Joel pushes back and insists that this mega-prosecution is the root cause of the impermissible, inordinate delay that transpired here and this court, he urges, should not countenance it. However, in considering a speedy trial challenge involving the prosecution of ten drug trafficking conspirators, this court deemed the joint proceeding an "efficient administration of justice," even when the time from arrest to trial took over three years. United States v. Casas, 425 F.3d 23, 33, 34 (1st Cir. 2005). Nonetheless, Joel argues the joint prosecution of fifty persons here certainly did not lead to efficiency as he waited more than five years to reach the first day of trial. As reasonably viewed, the efficient administration of justice is at least

questionable in this case and the delay causes us much concern. But given our conclusion that both sides contributed to the delay, we have no reason to reconsider Casas' efficiency rationale. So on we go.

Moving to the third factor -- when and how Joel and Carlos asserted their rights to a speedy trial -- we note they did file an unsuccessful motion to dismiss on this basis, albeit almost four years post-arraignment. Subsequently, Joel filed two notices asserting his right to a speedy trial -- one in December 2013 and another in May 2014 -- asking the district court to simply note that he was asserting his right but not requesting a responsive pleading from the government. In May 2015, after trial had been underway for ten months, Carlos claimed a speedy trial violation because he had already been detained for 72 months. This assertion came after codefendant Suanette sought an eight-week trial break due to pregnancy-related complications. In our view, in considering Joel's and Carlos's efforts to assert their speedy trial rights, while we cannot say they completely sat on their rights, their efforts were, at best, rather anemic. Barker, 407 U.S. at 531-32 ("Whether and how a defendant asserts his right . . . [and] [t]he strength of his efforts" reflects the degree of prejudice to defendants.).

With respect to the fourth factor -- prejudice -- we have previously "recognized three types of prejudice: 'oppressive

- 13 -

pretrial incarceration, anxiety and concern of the accused, and the possibility that the accused's defense will be impaired by dimming memories and loss of exculpatory evidence.'" Lara, 970 F.3d at 82-83 (brackets omitted) (quoting Doggett v. United States, 505 U.S. 647, 654 (1992)). Out of the gate, the government says that neither defendant explains how his defense was impaired -- i.e., prejudiced -- by the length of the delay. Nevertheless, Carlos argues this court has never confronted a delay of this length and given the presumption of prejudice beyond a one-year delay, our analysis should begin and end there.

Beyond the extraordinary delay, Joel claims prejudice, first citing the heightened and prolonged anxiety he experienced because he thought the government was retaliating against him for being acquitted in a Commonwealth death-penalty homicide trial. Second, that the "oppressive conditions of confinement while [he] was incarcerated" likewise need to factor into the prejudice analysis.[9]

Joel points to United States v. Black, 918 F.3d 243, 264-65 (2d Cir. 2019), in support of his claim of prejudice. While Black has the result Joel is looking for -- a dismissal due to

---

[9] As the government points out, Joel did not identify how the conditions at the prison were inhumane for him, in particular because he didn't articulate any reasons specific to him, pointing instead to a newspaper article about the general conditions at the prison.

- 14 -

speedy trial infractions of constitutional proportions -- the reason for the sixty-eight-month delay between indictment and trial in that case was attributed almost entirely to the government. For years it was unable to settle on the charges and it repeatedly flip-flopped on whether it was going to pursue the death penalty. Id. at 248 (government ultimately filed a superseding indictment with new charges almost three years after the indictment was filed, then announced it would not seek the death penalty). The defendants in Black also "repeatedly requested a speedy trial." Id. at 249. The anxiety to the defendants in Black caused by the uncertainty over whether they would face the death penalty in the case for which they stood trial was of a substantively different nature than the anxiety caused to Joel and his codefendants from their long wait to be tried for drug trafficking conspiracy.

While we clearly have grave concerns about the government's approach in this case which resulted in a protracted delay to verdict, we conclude the trial judge did not abuse her discretion in denying Joel's motion, joined by Carlos, to dismiss the indictment for violation of the Sixth Amendment's speedy trial guarantee. Balancing all four Barker factors, the presumed prejudice from the length of the delay is counterbalanced by Joel's and Carlos's contributions to the pretrial delays as well as the number of years they waited before asserting their speedy trial

rights.  See Lara, 970 F.3d at 80.  As such, Joel and Carlos have not shown how their ability to mount an adequate defense was hampered by the delay or how the trial judge abused her discretion by failing to so find.

That said, delaying the trial for those defendants who chose to exercise their constitutional right to have the government prove their guilt beyond a reasonable doubt while most of the rest of the codefendants changed their pleas certainly raises genuine concerns about the impact of the government's decision to charge and monolithically process "mega-cases" on defendants' rights to a speedy trial.  This five-year gap between the indictment and the start of trial does not sit well with us.  Some of the defendants spent this entire pretrial period detained while still presumed innocent.  When speedy trial rights claims are raised, drawing a line and knowing when it has been crossed is circumstance-dependent, but the defendants' five-year wait for trial was as close as it comes to infringement.  Despite their individual contributions to some of the delay, each defendant was forced to wait while forty-seven codefendants changed their pleas, changed their counsel, new counsel got up to speed on the case, and the judge processed and decided motions unrelated to them.  Even though the defendants made no showing of how their defenses were actually impacted by the delay, at the very least witnesses' memories would have dulled and faded over that time.

There is no perfect solution to efficiently prosecuting alleged large drug distribution conspiracy cases, but the government needs to better balance the efficiencies it enjoys by prosecuting these so-called "mega cases" with the defendants' rights to a speedy trial by considering ways to break those indicted into groups which can reach the first day of trial (when the defendants choose to exercise this right) sooner. Additionally and importantly, we note that the government's speedy trial argument as presented in its briefing makes clear that the government's reading of Casas is simply incorrect. We did not give our blessing there to multidefendant indictments regardless of the consequences, nor did we bless years of delay caused by allowing the time for codefendants' change of pleas to make it easier for the government to use codefendant testimony. When the government indicts, it should have enough evidence to prove the case as to each and every defendant without delays such as occurred here. When the government brings such large multidefendant criminal prosecutions, it assumes a considerable risk of violating the constitutional rights of defendants. It also risks losing convictions on appeal because of its choices, which are not necessary choices, to proceed with a sizable number of defendants (and/or overcharging).

And one final speedy trial coda before moving on: it would be wise for the district court to better strategize how to

move such multi-party cases through the judicial system given the constitutional (and statutory) implications attendant thereto. When the Department of Justice presents the district court with these very difficult-to-manage scenarios, the court has management tools available to it to see that the cases are handled more expeditiously. Such tools are known to the district courts and it may well be there can be agreements as to procedures likely to secure more expeditious handling. Given these clear words of caution, we would not expect to see such unprecedented procedural prosecutions in the future.

## The trial lasted 18 months
(Carlos)

After the trial started in July 2014, approximately 128 trial days were spread out over eighteen months, with the jury rendering its verdict in January 2016. The trial judge completed sentencing in May 2018. Carlos contends this "excessive trial length" was a violation of his Fifth Amendment right to due process. He argues he was prejudiced by the length of the trial, once it finally began, because during deliberations the jurors had to recall and process testimony they had heard over the course of the prior year-and-a-half. Our search of the record suggests this

is the first time Carlos is asserting such a due process infringement and Carlos directs us to nothing to the contrary.[10]

Because Carlos pivots to a due process argument on appeal, plain-error review applies -- "a standard that requires him to prove four things: (1) an error, (2) that is clear or obvious, (3) which affects his substantial rights . . . , and which (4) seriously impugns the fairness, integrity, or public reputation of the proceeding." United States v. Correa-Osorio, 784 F.3d 11, 17–18 (1st Cir. 2015).

Carlos presents a novel Fifth Amendment argument asking us to adopt and apply a modified four-factor speedy trial analytical framework to his due process claim. But he points to

---

[10] The government generously opines Carlos asserted this claim when he replied to codefendant Suanette's motion in the summer of 2015 requesting the eight-week trial recess. But a review of Carlos's response reveals he presented no such objection. Instead, Carlos only argued the court should reconsider his detention status and allow him bond during the break because the length of time he had been detained since his arraignment (72 months) violated his speedy trial rights. The trial judge denied the bond request. It is clear the judge understood Carlos to be making a speedy trial motion because she responded to it by distributing a table reflecting the calendar days since the trial began when a full day of trial had not occurred and the reasons why trial had not been held -- or held for only half a day -- on any given day. The reasons ranged from illness on the part of a juror, an attorney, and a defendant, to scheduling conflicts across the board. The trial judge noted that none of the defendants had objected to the trial interruptions as they occurred and reiterated her speedy trial conclusion from the earlier motion -- "[d]efendants cannot trigger excludable delays during the pretrial stage [referring to the pretrial motions] and simultaneously log them as speedy trial violations."

no case -- binding or otherwise -- in which we or the Supreme Court have done so.  Consequently, there cannot be any clear or obvious legal error on the part of the trial judge.[11]  See United States v. McCullock, 991 F.3d 313, 322 (1st Cir. 2021) (an error is clear or obvious when a trial judge disregards controlling precedent).  Therefore, Carlos's argument on this point stumbles at the threshold.

## MOTIONS TO SUPPRESS

In this section, we examine Juan's and Joel's arguments that the trial judge erred in denying two motions to suppress.

### The notebook from Juan's apartment
(Juan)

Police found a notebook full of names and phone numbers in Juan's apartment during a warrantless search.  According to Juan, this notebook, admitted into evidence at trial, should have been suppressed as obtained in violation of his Fourth Amendment rights because the Drug Enforcement Administration ("DEA") agent who seized the notebook did so when Juan was not home and without obtaining voluntary consent from his wife prior to the search.  As

---

[11] Moreover, it is unclear how Carlos considers the trial judge to have erred because, on appeal, he challenges neither the denial of his request for bond nor the judge's response to his speedy trial violation assertion based solely on the length of the trial.  To be sure, the trial in this case was protracted and, as Carlos points out, there are many disadvantages to a criminal trial spreading over such a long period.  However, as the trial judge pointed out, there were myriad reasons why the trial took so long.

we explain below, Juan waived this argument, so we decline to reach the merits.

After Juan filed a motion to suppress the notebook, a magistrate judge listened to testimony from one of the DEA agents and Juan's wife, and he ultimately recommended the district court deny the motion after concluding the government had adequately shown Juan's wife did voluntarily consent to the search. The magistrate judge's R&R had the usual warning: the parties had 14 days to file any objections to it and failure to object within that timeframe waived the right to appeal the order. Juan filed no objection and the trial judge approved and adopted the R&R.

Our procedural rules and case law are crystal clear that when, as here, a party fails to file an objection to an R&R, the party has waived any review of the district court's decision. United States v. Díaz-Rosado, 857 F.3d 89, 94 (1st Cir. 2017); Fed. R. Crim. P. 59(a); see also Garayalde-Rijos v. Mun. of Carolina, 747 F.3d 15, 21-22 (1st Cir. 2014) (noting the party had notice that the failure to object would result in waiver of further review of the decision); Davet v. Maccarone, 973 F.2d 22, 31 (1st Cir. 1992). We move on to the preserved suppression issue Joel raises.

## The gun from Joel's father's car
(Joel)

Before trial, Joel sought suppression of a gun seized from the car he was driving when a law enforcement agent pulled him over outside his home. On appeal, Joel challenges the trial judge's denial of that motion.

"[W]hen we review a challenge to a district court's denial of a motion to suppress, we are to 'view the facts in the light most favorable to the district court's ruling' on the motion." United States v. Rodríguez-Pacheco, 948 F.3d 1, 3 (1st Cir. 2020) (quoting United States v. Camacho, 661 F.3d 718, 723 (1st Cir. 2011)). "[W]e recite the key facts as found by the district court, consistent with the record support." Id. (quoting United States v. Young, 835 F.3d 13, 15 (1st Cir. 2016)).

On February 26, 2009, agents from an investigative group called the Carolina Strike Force ("CSF") set up surveillance of the Los Claveles Public Housing Project in Trujillo Alto after receiving a tip from a reliable informant that the leaders of the drug trafficking organization under investigation met there on Thursdays to pick up money from the previous week's drug sales. The agents watched Joel drive into the housing complex in his father's car and leave in it, heading in the direction of his house in Villa Margarita. Officer Agustin Ortiz saw the car's windows were likely tinted darker than allowed by Puerto Rico law, so he

used his siren to initiate a stop. Instead of pulling over immediately, Joel indicated with his hand that Officer Ortiz should follow him. He eventually stopped at the gate in front of his driveway. Several family members exited the house and walked toward the car. Officer Evette Berrios Torres saw Joel trying to move a black object on the floor of the driver's seat with his foot while his mother was leaning against the car and trying to pick something up with her hand. Recognizing the object was a black pistol (which turned out to be a Glock model 26, .9 mm pistol) Officer Berrios seized it. Joel was arrested.

In a motion to suppress the gun, Joel detailed the same basic sequence of events as recited above and argued multiple reasons why the warrantless search of the vehicle violated his Fourth Amendment rights: law enforcement had no reasonable suspicion there was contraband in the car, the traffic stop for the allegedly illegal tint on the windows was clearly a pretext to search the vehicle, and he was forcibly removed from the vehicle after law enforcement opened the car door and saw the gun in plain view. Joel attached three documents to his motion: the warrant application and supporting affidavit for the car search (obtained after Joel was pulled over and arrested), a written declaration by Joel's father (who was at the house when Joel stopped the car and saw the series of events unfold), and a photo of the driver's area of the car (taken a few steps back from the open driver's side

door).  Joel did not request an evidentiary hearing.  Joel's father's recitation of what occurred during the traffic stop did not conflict with law enforcement's rendition:  he briefly stated that, after Joel stopped his car at the front gate of their home, "law enforcement personnel surround[ed] the vehicle and instruct[ed] Joel to unlock the car door."  "After Joel unlocked the door, law enforcement personnel opened the car door and removed him from the vehicle."  Joel was not given a traffic ticket for the tinted windows on this day and his father was not given such a ticket for the vehicle at any other time.

The government opposed Joel's motion to suppress, arguing, first, the dark tint on the windows gave Officer Ortiz probable cause to stop the car and second, no Fourth Amendment violation had occurred because the gun had been seen in plain view and thus properly seized without searching the car.  The trial judge denied the motion to suppress in a written order, relying on the documents Joel filed in support of his motion.[12]

During the trial, Puerto Rico Officer Ortiz (assigned to the Bureau of Alcohol, Tobacco, Firearms ("ATF") as an investigating agent but part of the CSF in 2008 and 2009) provided

---

[12] The judge found there was no evidence the law enforcement agents had exercised physical force and that Joel had conceded the gun was in plain view when the police opened the unlocked door. Regardless, the judge concluded the police had probable cause to search based on Joel's behavior from the first wail of the siren through to the seizure of the gun.

more detail about how the gun was found in Joel's father's car.[13] Officer Ortiz had been assigned to be in a police cruiser on the day in question, ready to act if needed.  In addition to describing the sequence of events as laid out above, he stated he pulled the car over both because the car had darkly tinted windows and because he needed to confirm Joel was in the car.  He testified that while he did not test the tint level that day, he is trained in how to test the tint on the windows and perceived a difference between the tints on the front versus the back windows, with the front window tinted impermissibly darker.

He testified that when Joel stopped the car in front of the gate at the house, Joel opened the driver's side door and placed his left leg outside of the car, while honking the horn and calling out for someone to open the gate.  Officer Ortiz told Joel to turn off the car, but another officer opened the front passenger door and turned off the ignition.  Officer Ortiz said Joel's mother came out of the house saying "leave my son alone," then indicated she was going to faint, all the while leaning against the car and reaching inside.  Agent Berrios walked up to Officer Ortiz to help with Joel's mother and Agent Berrios saw the firearm on the floor

---

[13] We may consider this testimonial evidence from the trial because Joel renewed his suppression motion.  See United States v. Howard, 687 F.3d 13, 17 (1st Cir. 2012); United States v. de Jesus-Rios, 990 F.2d 672, 675 n.2 (1st Cir. 1993).

of the car, near Joel's right foot.  According to Officer Ortiz, "tactical operations [are] a heated, . . . hostile environment." The situation was so heated, according to Officer Ortiz, that he couldn't give the ticket for the dark tint on the windows and then he forgot to issue the ticket once everyone was at the police station.  Following Officer Ortiz's testimony, Joel renewed his motion to suppress the gun.  Again, it was denied.

We have long-established standards for reviewing a district court's denial of a motion to suppress:  we consider the motion anew, giving full deference to the district court's findings of fact (disturbing them only if the record reveals the findings were clearly wrong), and upholding the denial "if any reasonable view of the record supports it."  United States v. Gonsalves, 859 F.3d 95, 103 (1st Cir. 2017).  Stated slightly differently, "[u]nder this rubric we can likewise affirm a denial on any basis apparent in the record."  Id.  Applying this standard, we affirm the denial of Joel's motion to suppress the gun.

We can quickly dispose of one argument Joel raises here: that the trial judge erred by not conducting a pretrial hearing before denying the motion to suppress, instead relying on the search warrant application and supporting affidavit completed after the warrantless stop.  The government responds that Joel was not entitled to a hearing on his motion because he hadn't pointed to any disputed facts.  Generally, the district court has

discretion as to whether it holds an evidentiary hearing when considering a motion to suppress evidence, so abuse of discretion informs our review of the trial court's denial of an evidentiary hearing. United States v. Ponzo, 853 F.3d 558, 572 (1st Cir. 2017). "A defendant has no right to an evidentiary hearing unless he shows 'that material facts are in doubt or dispute, and that such facts cannot reliably be resolved on a paper record' -- most critically, he 'must show that there are factual disputes which, if resolved in his favor, would entitle him to the requested relief.'" Id. (quoting United States v. Francois, 715 F.3d 21, 32 (1st Cir. 2013)). Notably, Joel still has not pointed to any material facts about the stop and seizure of the gun he believes are in dispute. Additionally, Joel never requested a hearing, either in his pretrial motion to suppress or when he renewed his motion during trial. The trial judge did not, therefore, abuse her discretion by not holding a hearing.

Aside from his procedural gripe, Joel argues Agent Ortiz did not have any "specific articulable facts to justify" pulling him over because the level of tint on the windows was merely a disingenuous pretext for the stop. The government says the tinted windows provided plenty justification. We agree. There is no doubt that "[a]n officer can stop a car if he sees a driver commit a traffic offense, even if the stop is an excuse to investigate something else." United States v. McGregor, 650 F.3d 813, 820

(1st Cir. 2011) (citing Whren v. United States, 517 U.S. 806, 810 (1996)).  The officer can then order those inside the vehicle to get out.  Id. (citing Maryland v. Wilson, 519 U.S. 408, 410, 414-15 (1997)).  Officer Ortiz, based on his training and experience, testified he initiated the traffic stop in part because he noticed Joel's unlawfully tinted front window.  This alone, under the governing case law, is adequate justification for the stop.[14]

Joel raises no challenge to the seizure of the gun once he stopped the car.  And there is no dispute Officer Berrios saw the gun on the floor of the driver's seat when Joel was exiting the car, which the trial judge so found.  The denial of Joel's suppression motion is, therefore, affirmed.

## EVIDENTIARY ISSUES

The defendants raise a litany of evidentiary issues, which we address in turn.  These issues include whether:

- the handwritten notes from law enforcement's interviews with codefendants should have been produced to the defendants;
- the handwritten notes on a series of documents admitted as business records were properly admitted for a limited purpose;
- the scope of cross-examination of some witnesses was improperly limited;

---

[14] For the first time on appeal, Joel argues -- spilling lots of ink -- that Officer Ortiz lacked probable cause to stop him because the supposed tip from an informant that the organization's leaders met at a specific location each Thursday flunked the long-established standards for reliability and credibility for tips. Bypassing forfeiture and plain error review, we decline to address Joel's argument because, as the government correctly points out, the stop was justified by the tinted windows infraction.

- proffered impeachment testimony was erroneously disallowed; and
- the trial judge should not have allowed multiple witnesses to testify about the same investigatory incident.

In order to sensibly address these issues, we need to introduce four men who were indicted along with the defendants but pled guilty before trial and became CWs for the government: Manuel Ferrer Haddock ("Ferrer"), Jaime Lopez Canales ("Lopez"), Jamie Rivera Nieves ("Rivera"), and Miguel Vega Delgado ("Vega").[15] Testifying law enforcement agents involved in the investigation also feature prominently in the evidentiary challenges raised in this next section. We will provide a summary of their testimony that is relevant to the evidentiary issues raised here as we go.

### Rough notes from interviews with CWs
(Suanette, Juan)

Law enforcement officers jotted down informal notes when they formally interviewed CW Lopez and CW Ferrer. They then prepared official reports which Suanette and Juan received. Both defendants contend the "rough notes" should have been given to them during the trial upon their request. Suanette's arguments here focus on the notes' supposed value as exculpatory evidence while Juan's claims hinge on an alleged Jencks Act violation.

---

[15] Per "Spanish naming conventions, if a person has two surnames, the first (which is the father's last name) is primary and the second (which is the mother's maiden name) is subordinate." United States v. Martínez-Benítez, 914 F.3d 1, 2 n.1 (1st Cir. 2019).

In August 2014, Suanette filed a motion to compel the production of the "rough notes" from CW Lopez's interview. Invoking both the Jencks Act (18 U.S.C. § 3500) and Brady v. Maryland, 373 U.S. 83 (1963) (but not explaining how either entitled her to the notes she sought), Suanette said these "rough notes" were "fundamental in corroborating the witness information in the DEA report and to verify" the consistency of CW Lopez's testimony before the grand jury and trial jury. Suanette also asked that, in the alternative, the notes be produced to the trial court for in camera inspection before ruling.

At the court's request that Suanette explain her "need" for the notes, Suanette provided additional details to support her motion for production. Suanette admitted she'd received "synops[e]s" of the Lopez interviews, but complained they were insufficient because they captured the agents' "interpretation[]" of what . . . [Lopez] told them" and not the raw information straight from his mouth. Also in her response, Suanette claimed although she had evidence CW Lopez had not mentioned her during his first interview she was also entitled to the rough notes from his other four interviews because if Lopez did not name her in any of these subsequent interviews then those notes would also be exculpatory evidence.

In a written order, the trial judge denied Suanette's motion to compel, concluding neither the Jencks Act nor Brady entitled her to the rough notes. Labeling "sheer speculation" Suanette's argument that the agents' interview summaries might be missing "evidence or information favorable to them of an exculpatory nature," she concluded Suanette had not made a "colorable [Brady] claim." With respect to Suanette's Jencks Act contention, the judge concluded she would only be entitled to the notes if CW Lopez actually adopted the contents of the agents' interview notes as his own.

On appeal, Suanette again argues that, because the official DEA report of all CW Lopez's interviews did not include her name in connection with the conspiracy, the rough notes are exculpatory as well as impeachment evidence that should have been produced pursuant to Brady: exculpatory because the reasonable inference from the failure to name her is that she was not involved in the conspiracy and impeachment because the notes contradicted CW Lopez's trial testimony. There, he testified that he bought marijuana from Suanette at the drug point in Villa Margarita on Amapola Street from 2007 to 2008 and she "collected the money" from the customers while her husband handed over the product, information which, if true, would have found its way into the rough notes. Plus, according to Suanette, his testimony about her alleged involvement supposedly conflicted with that of CW Vega.

- 31 -

(We'll get into this supposed conflicting testimony a little later when we address Suanette's sufficiency argument). By not having this supposedly exculpatory evidence during the trial Suanette says she was prejudiced.[16] If there was doubt about the relevance of the rough notes, the trial judge, at minimum, should have made an in camera inspection of them.

The government responds that the trial judge did not abuse her discretion when she denied Suanette's motion to compel because the rough notes were immaterial and not likely exculpatory. Immaterial because Suanette already knew and had evidence CW Lopez never told law enforcement agents she was part of the drug conspiracy -- her name was not on the list of alleged members of the drug trafficking organization that law enforcement included in their official report from the interviews with him. Further, as the government points out, Suanette cross-examined CW Lopez at length about whether he had mentioned her during his formal interviews. The rough notes were also immaterial because CW Lopez was not the only witness to testify about Suanette's drug transactions.

---

[16] We do not discern any argument on appeal challenging the trial judge's conclusion that the rough notes sought were not discoverable pursuant to the Jencks Act. We read Suanette's argument to focus entirely on the value of the rough notes as exculpatory and impeachment evidence. But we will soon get into the Jencks Act when we address Juan's arguments about rough notes from CW Ferrer's interviews below.

As for the trial judge's refusal to inspect the notes in camera, the government says Brady does not allow fishing expeditions and Suanette did not show the notes would contain exculpatory or impeachment information that was not already in other documents in her possession. As we view it, the government has the better arguments on this issue, and we'll explain why after first setting out the governing legal principles.

A trial judge's conclusion that information is not exculpatory under Brady gets examined through an abuse-of-discretion lens. United States v. Schneiderhan, 404 F.3d 73, 78 (1st Cir. 2005) (citing United States v. Rosario-Peralta, 175 F.3d 48, 55 (1st Cir. 1999)). To make an effective Brady claim, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [government], either willfully or inadvertently; and prejudice must have ensued." United States v. Avilés-Colón, 536 F.3d 1, 19 (1st Cir. 2008) (quoting Strickler v. Greene, 527 U.S. 263, 281-82 (1999)). "The import of withholding evidence is heightened 'where the evidence is highly impeaching or when the witness' testimony is uncorroborated and essential to the conviction.'" Id. (emphasis omitted) (quoting Conley v. United States, 415 F.3d 183, 189 (1st Cir. 2005)). "Suppressed impeachment evidence is immaterial under Brady, however, if the

evidence is cumulative or impeaches on a collateral issue." Id. (quoting Conley, 415 F.3d at 189).

After reviewing the record as a whole, we do not see how Suanette could have gained anything substantial from the production of the rough notes from CW Lopez's interviews, even if, had they been produced, they revealed no mention of Suanette's name. Here's why: as Suanette herself discusses in her brief, she asked one of the law enforcement agents who interviewed CW Lopez if Lopez ever mentioned Suanette during his interviews. The agent said he couldn't remember. When pressed again, the agent agreed that he would have "[m]ost likely" written her name down if CW Lopez had mentioned her. This exchange makes the precise point Suanette says she needed to make.

Moreover -- and as the government indicates -- the DEA's official report of the interviews with CW Lopez included a list of the members of the drug trafficking organization under investigation that CW Lopez fingered, and Suanette wasn't on that list. We fail to see how the absence of her name from the rough notes -- if that is what the rough notes actually confirmed -- could have had more qualitative value than the absence of her name from the list of members in the DEA's summary report. In consequence, the rough notes were immaterial and also cumulative of other evidence in the record. Therefore, the trial judge's

decision denying Suanette's motion to compel production of the rough notes was hardly an abuse of her discretion.

CW Ferrer
(Juan)

During the trial testimony of CW Ferrer, Juan's counsel, pursuant to the Jencks Act, moved for production of the rough notes from CW Ferrer's interviews with law enforcement agents. Juan's counsel wanted more than the summaries already provided by the government because, according to him, CW Ferrer was adding new details to his testimony and because of this, he wanted the notes to compare what CW Ferrer said back then to what he was saying in court. The trial judge verbally denied the motion and addressed it again when she ruled on Suanette's written motions for the production of the rough notes from CW Lopez's interviews. In the written order, the trial judge left the production issue open for further consideration depending on how he answered a couple of questions. Because the Jencks Act requires a witness to sign or verify a third party's accounting of the witness's testimony, she ruled she would ask CW Ferrer if the government agents read their notes back to him during his interview and whether he had approved the notes as read back.

During trial, the trial judge did precisely as she said she would. CW Ferrer stated he could recall some notes read back to him but not whether he approved them, or if he did, whether it

- 35 -

was verbally or by signing something. He was interviewed on at least seven occasions and did not recall what or how much was read back to him on any given day, nor whether he had raised any discrepancies between what he said and what was read back to him. The trial judge declined to order production of the rough notes because she lacked the required affirmative evidence that CW Ferrer adopted the written notes as his own. Therefore, they did not qualify as Jencks Act statements.

On appeal, Juan contests the trial court's findings. He asserts CW Ferrer did in fact adopt the rough notes because he testified that the notes were read back to him even if he could not remember if he approved them verbally or in writing and did not recall discussion of any discrepancies. Jencks requires nothing more, he says. The government says that the trial judge committed no error. Juan had all he needed to cross-examine Ferrer about his interviews with the agents -- the DEA-6 report (the official report of the investigation).

Our review of the trial judge's Jencks Act determination is for abuse of discretion. See Schneiderhan, 404 F.3d at 78.

"The Jencks Act, 18 U.S.C. § 3500, in concert with Fed. R. Crim. P. 26.2, controls the production of certain witness statements in the government's possession." United States v. Marrero-Ortiz, 160 F.3d 768, 775 (1st Cir. 1998). "[T]o be discoverable under the Jencks Act, a government record of a witness

interview must be substantially a verbatim account." United States v. Sepulveda, 15 F.3d 1161, 1179 (1st Cir. 1993) (citing United States v. Newton, 891 F.2d 944, 953-54 (1st Cir. 1989)). In addition -- and most importantly here -- "the account must have been signed or otherwise verified by the witness himself." Id. (citing United States v. Gonzalez-Sanchez, 825 F.2d 572, 586-87 (1st Cir. 1987)).[17]

"Where a defendant requests discovery of potential Jencks material, our precedent requires the district judge to conduct an independent investigation of any such materials and determine whether these materials are discoverable under the Jencks Act." United States v. Gonzalez-Melendez, 570 F.3d 1, 3 (1st Cir. 2009) (per curiam) (emphasis omitted).

> This independent review may include such measures as *in camera* inspection of any disputed document(s), and conducting a hearing to evaluate extrinsic evidence, including taking the testimony of the witness whose

---

[17] 18 U.S.C. § 3500(b) provides that:

After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

Crucial for Juan's argument, however, is that a statement is defined in § 3500(e)(1) in relevant part as "a written statement made by said witness and signed or otherwise adopted or approved by him." (Emphasis added.)

- 37 -

> potential statements are at issue as well as the person who prepared the written document in which those statements appear.

Id. at 3 n.2 (citing Goldberg v. United States, 425 U.S. 94, 108-09 (1976)).  As we previously described, the trial judge did just that:  she undertook the required "independent investigation" when she probed CW Ferrer's recollection and understanding of the agents' interview notes.  See id. at 3 (emphasis omitted).  She even expanded the inquiry by allowing Juan's attorney to ask clarifying questions before explaining her Jencks Act ruling.

In support of his claim of error, Juan insists the facts here are analogous to those in Goldberg, where a CW who had been interviewed by prosecutors a few times prior to trial couldn't perfectly recall whether the attorneys' handwritten notes were read back to him or whether he was always asked if the notes were accurate.  425 U.S. at 100-101.  Even though the Goldberg court remanded, this case is not helpful to Juan because the Supreme Court was primarily focused on whether the notes were attorney work product.  Id. at 101-08.  Indeed, part of the scope of the ordered remand was for the trial court to determine, as a matter of fact, whether the "notes were actually read back to [him] and whether he adopted or approved them."  Id. at 110.  We conclude then, as the trial judge did, that the government was not obligated to produce these rough notes because the trial court's investigation did not establish CW Ferrer approved the notes taken

during his interviews and the notes did not therefore qualify as statements pursuant to the Jencks Act.  See Marrero-Ortiz, 160 F.3d at 775-76 (holding the government had no obligation to produce rough notes taken by a government official during an interview with an individual who testified for the government at trial because there was no evidence on the record that the witness adopted the notes).  The trial judge did not abuse her discretion.

### Business records from North Sight Communications
(Joel, Carlos, Juan)

One piece of physical evidence admitted during trial was a set of business records from North Sight Communications ("North Sight"), a business with whom one of the members of the conspiracy had an account for cell phones with a walkie-talkie-type functionality.  Some of the pages of the records had handwritten notes, linking each specific device associated with the account to a specific individual.  Joel, Carlos, and Juan challenge the trial judge's decision to admit these handwritten notes.

Here's how these notes and records were allowed:  about halfway through the trial, Angel Miranda, Vice President of North Sight, testified that his company offered Motorola iDEN service, which allowed a cellular phone to be used as a walkie-talkie as well as a regular phone and, with the right plan, one phone could radio broadcast to several other units at the same time.  Miranda explained that when a fleet (or large group) of devices was issued

under one account, a North Sight employee made handwritten notes as a regular course of business on the customer's printed account documents connecting the name of each individual who had a device with the device assigned to that individual. These handwritten notes were made while the customer stood in front of the employee and indicated who had which device listed on the account. These hard copy invoices and other records on the account were then stored in physical files.

The file for the account opened under the name Carlos Rivera Rivera (aka Carlitos, Suanette's husband, one of the individuals indicted along with the other defendants in this case) included approximately 100 pages and was admitted as an exhibit at trial, over the defendants' objections, under the business record exception to the rule against hearsay. In line with Miranda's description of North Sight's business practice, some of the pages reflected handwritten names and numbers, including the first names or nicknames of some of the defendants presently appealing.

The defendants objected on the basis that the handwritten notations presented impermissible double hearsay. After lengthy voir dire of the witness and much argument by counsel, the trial judge concluded the "handwritten notes on those pages [were] . . . probative of association between members of the alleged conspiracy. There's no other possible probative value." The trial judge proposed a limiting instruction for the jury to

make it clear that the jury could only consider the handwritten notes for the purpose of deciding whether the names reflected in the notations might be associated with one another. According to the trial judge, "there's no double hearsay problem if that's the only purpose for which it's allowed." The trial judge issued two written orders on this evidentiary ruling as well.

The trial judge issued the following limiting instruction to the jury:

> Members of the jury, I instruct you that you can consider all of the 105 pages of this Exhibit 177 for the truth of the data or the matters contained in those pages except for the annotations handwritten by the North Sight Communications employee whose source of information was an outsider and which appear at these particular pages, 33-34, 61, 69, 94-95, 99 and 101. These handwritten notes on these specific pages can only be considered by you, the jury, for the limited purpose of determining whether the same -- referring to the notes, handwritten notes -- establish association among the alleged members of the drug conspiracy as charged in the Indictment.

Joel asked the trial judge to reconsider her ruling and she explained in an order considering his request that the admission of the handwritten notes was "for the limited purpose of the jury determining whether the records establish an association between the alleged members of the drug conspiracy charged. This is no different than tallies, logs, ledgers, contact lists . . . which are admitted in determining association in criminal activity."

We review preserved objections to "[e]videntiary rulings, including whether to admit evidence over a hearsay

objection, . . . for abuse of discretion." United States v. Colón-Díaz, 521 F.3d 29, 33 (1st Cir. 2008).

Juan, Carlos, and Joel all argue that the judge was wrong to admit these handwritten notes for any purpose because the accuracy and veracity of the notes could not be confirmed. These defendants emphasize that, if the jury was allowed to consider whether the notes showed association between the alleged conspirators, then the jury would first have to consider the notes to be true and accurate.

The government responds that the handwritten notations were properly admitted with limitation to infer association between the names in the notes and the defendants on trial as well as the association between the alleged members of the conspiracy -- the court's limiting instruction appropriately tailored these purposes. This court, argues the government, has previously allowed circumstantial evidence of association between alleged coconspirators when, for example, a payroll list seized from a defendant's bedroom was admitted for this limited purpose and the jury was told not to consider it for the truth of the information contained on it. United States v. Hensel, 699 F.2d 18, 33-35 (1st Cir. 1983). The government also points us to the admission of a hand-written drug ledger kept on a pad of paper by a codefendant for the purpose of showing the existence of a drug conspiracy. Casas, 356 F.3d at 124-25. Of course, as Juan and Joel point out,

these cases involved a codefendant as the author of the writings, whereas here there is no suggestion that a codefendant wrote the notations on the admitted North Sight business records or even verified what had been written.  This is an important distinction, which the trial judge did not appear to consider when articulating her decision to allow the handwritten notes here.

We need not decide whether this distinction means the trial judge erred when she admitted the exhibit for the limited purpose expressed because, even if she erred, the error was harmless and doesn't warrant disturbing the jury verdict.[18]  See United States v. Laureano-Pérez, 797 F.3d 45, 68-69 (1st Cir. 2015) (declining to decide whether an error had been made because the error, if any, was harmless).  Improperly admitted evidence "is harmless if it is 'highly probable that the error did not influence the verdict.'"  United States v. Meises, 645 F.3d 5, 23 (1st Cir. 2011) (quoting United States v. Flores-de-Jesús, 569 F.3d 8, 27

---

[18] Juan's discussion of United States v. Blechman, an out-of-circuit case holding the trial court in that case erred by admitting online account records as a business record exception to the rule against hearsay, 657 F.3d 1052, 1056-58, 1066 (10th Cir. 2011), is not what persuades us there may have been error here. As the trial judge aptly distinguished in her order addressing Joel's request that she reconsider her ruling about the handwritten notes on the North Sight records, the district court in Blechman had admitted the documents as Federal Rule of Evidence 803(6) business records, whereas she acknowledged the double hearsay problem with the handwritten notes and did not admit them for that reason, but allowed the jury to see the notes for the expressly limited purpose she articulated.

(1st Cir. 2009)); see also United States v. Montijo-Maysonet, 974 F.3d 34, 49 (1st Cir. 2020) (error may be considered harmless when "the record minus the improper[ly admitted evidence] gives us 'fair assurance . . . that the [jurors'] judgment was not substantially swayed by the error'" (quoting Kotteakos v. United States, 328 U.S. 750, 765 (1946))). The harmlessness "inquiry requires a case-specific examination of factors that include 'the centrality of the tainted material,' its prejudicial impact, and any other indications that 'the error affected the factfinder's resolution of a material issue.'" Meises, 645 F.3d at 24 (quoting Sepúlveda, 15 F.3d at 1182). The burden to establish harmlessness falls on the government, id.; the government carried this burden by pointing to the ample other evidence that by itself convincingly established the necessary connections among Juan, Carlos, and Joel, and with other alleged members of the drug enterprise.

The government has shown that, without the exhibit in question, there was other evidence that Juan, Carlos, and Joel knew each other and associated with other alleged members of the drug conspiracy. For example, with respect to Juan, one of the testifying law enforcement agents (Special Agent Cedeño) told the jury during trial that the notebook seized from the kitchen of Juan's apartment included a list of names and phone numbers; the names corresponded to nicknames of several of the other alleged members of the organization. Another law enforcement agent

testified about watching Juan's authority over other suspected members during one part of the investigation when Juan ordered these men to comply with that law enforcement agent's instructions to the group of them. And CW Vega testified he observed Juan receive pre-packaged drugs from other people CW Vega knew to be members of the drug enterprise.

In addition, CW Ferrer testified about his participation in meetings among alleged coconspirators including Juan, Carlos, and Joel. One such meeting occurred when CW Ferrer and his cousin were physically with Carlos and Joel; CW Ferrer testified he watched Joel speak with Juan using a walkie-talkie type of function on his cell phone to ask Juan questions about why Juan was not with them in person. These examples of evidence in the record show that apart from the handwritten notes the jury had other convincing evidence from which to find the alleged members of the drug enterprise knew each other and spent time together. As a result, the government has shown that any error in admitting the North Sight business records with the handwritten notations was harmless because it was "highly probable" this single exhibit did not sway the verdict. Id. at 23.

### Limited cross-examinations
(Idalia, Juan, Joel, Carlos)

Up next is whether the trial judge impermissibly limited the scope of cross-examination of some of the witnesses. Idalia,

Juan, Joel, and Carlos contend the trial judge did just that in violation of their Sixth Amendment Confrontation Clause rights. "The Confrontation Clause of the Sixth Amendment guarantees criminal defendants the right to cross-examine witnesses who testify against them," United States v. Casey, 825 F.3d 1, 23-24 (1st Cir. 2016) (citing United States v. Vega Molina, 407 F.3d 511, 522 (1st Cir. 2005)), so defendants can "test the believability of a witness and the truth of his testimony," United States v. Rivera-Donate, 682 F.3d 120, 126 (1st Cir. 2012) (quoting United States v. González-Vázquez, 219 F.3d 37, 45 (1st Cir. 2000) (internal quotation omitted)). "This right is not without limits, however; the district court wields considerable discretion to impose 'reasonable limits' on cross-examination." Casey, 825 F.3d at 24 (quoting United States v. Raymond, 697 F.3d 32, 39-40 (1st Cir. 2012)). "When a witness's credibility is at issue, the trial court may limit cross-examination as long as the court allows sufficient leeway to establish a reasonably complete picture of the witness' veracity, bias, and motivation." Rivera-Donate, 682 F.3d at 126 (quoting González-Vázquez, 219 F.3d at 45) (internal quotation omitted). "We review de novo whether a defendant was afforded a reasonable opportunity to impeach a witness, and for abuse of discretion limitations the trial court

- 46 -

imposed on that opportunity."  Casey, 825 F.3d at 24 (citing Raymond, 697 F.3d at 39-40).

CW Vega
(Idalia)

Idalia argues the trial judge infringed her Confrontation Clause rights when Idalia was not permitted to question CW Vega about whether he had met with the prosecutors outside the courtroom after he started testifying.  Here's how this controversy unfolded during trial:  CW Vega was one of the witnesses who testified about his observations of, and interactions with, Idalia.  When he first testified about the timing and frequency of his crack cocaine purchases from Idalia at the residence she shared with her husband, codefendant Carlos, during the summer of 2006, CW Vega said he bought crack from a "woman" but he was not asked if the woman from whom he bought the crack was in the courtroom and he did not offer an in-court identification on his own.  He indicated he had not known -- or ever found out -- who the "woman" was the first time he encountered her when he'd approached Carlos's house looking to buy crack from Carlos but bought instead from the woman who'd emerged from the house when he had yelled for Carlos.  CW Vega also testified that he bought vials of crack from this woman at this house around sixteen times over a one-to-two month period and, during this same

period, he also bought vials of crack from Carlos from this same house.

A few days into his testimony (he testified on at least nine separate days), the prosecutor sought to introduce a photo of Idalia. Idalia's attorney objected because CW Vega had not identified Idalia a few days prior when he had been testifying about his crack purchases from the woman at Carlos's house. At the court's suggestion, the prosecutor asked CW Vega if the woman from whom he had purchased the crack was in the courtroom and he identified Idalia without any detectable hesitation in open court.

The next morning, Idalia's counsel raised a concern about potential prosecutorial misconduct after a codefendant's counsel reported to her that his client had seen two of the prosecutors leave the room in the courthouse where testifying witnesses typically cooled their heels when they weren't on the stand. The codefendant was clear that she had not seen CW Vega (or anyone else) in the room, but Idalia's counsel expressed a concern that, because CW Vega initially testified he had not known the identity of the woman at Carlos's house who sold him crack in June 2006 but a few days into his testimony identified Idalia in court as that woman, the prosecutors had influenced his memory and subsequent identification of her.

One of the prosecutors volunteered that she had been in the witness room with CW Vega a couple of times to discuss

scheduling and dietary matters but adamantly denied discussing any part of his testimony with him. The trial judge lightly reprimanded Idalia's counsel for jumping to conclusions without a stronger basis because seeing prosecutors emerge from a room holding trial papers did not in and of itself mean there was any misconduct. The trial judge also reminded Idalia's counsel that she would have an opportunity to cross-examine CW Vega about his in-court identification.

During Idalia's cross-examination, CW Vega answered "no" when first asked whether he had met with the prosecutors during his testimony. After CW Vega confirmed his testimony with respect to not knowing the identity of the woman the first night a woman sold him the vials of crack at Carlos's house and then identifying Idalia when asked if he saw the same woman in the courtroom, Idalia asked whether he had met with the prosecutors during the lunch recess immediately prior to his in-court identification of Idalia. The trial judge did not allow CW Vega to answer the question, removed the jury from the courtroom, and admonished Idalia's counsel for her inquiry into this subject when the trial judge had already inquired and resolved it when she determined there was no indication of any actual misconduct.

On appeal, Idalia asserts the trial judge erred by not allowing her to cross-examine CW Vega about his suspected lie when he said he had not met with prosecutors during the course of his

several days of testimony.  Idalia contends that, beyond the issue of impeaching CW Vega's credibility, the limit placed on her cross-examination meant she could not explore his "reliability and potential suggestiveness."  Idalia refers to this issue in her brief as a violation of her "due process" rights but her analysis is actually structured as a Sixth Amendment Confrontation Clause challenge, so we shall follow her lead and proceed under this latter framework.

The government counters Idalia had been permitted to cross-examine CW Vega extensively about his interactions with the woman who sold him crack as well as his subsequent identification of this woman as Idalia.  As such, says the government, the trial judge did not abuse her discretion to reasonably limit the scope of cross-examination.

After reviewing the transcript of CW Vega's testimony on direct and cross-examination, in our view, there is no doubt Idalia was provided an adequate, reasonable opportunity to impeach CW Vega's direct testimony about his interactions with -- and identification of -- the woman from whom he bought the vials of crack.  Idalia asked a series of detailed questions checking his testimony from the day he discussed his purchases to the day he identified Idalia in court.  Idalia also asked a long series of questions delving into the history of CW Vega's drug use and effects he experienced while using drugs.

When the trial judge cut off Idalia's attempt to bring up the conversations in the witness room between CW Vega and the prosecutors, she explained her concern that the trial would turn into an evidentiary hearing about the dubious conversation and she did not think such inquiry was justified based on what Idalia's codefendant reported observing and what the prosecutor acknowledged. But Idalia was permitted to continue her cross-examination after the trial judge told counsel to refrain from the inquiry about the witness room. Moreover, as Idalia herself points out, CW Vega's credibility was laid to bare when he admitted during cross-examination by counsel for a codefendant that he had deceived both probation officers and judges in the past, which she concludes must mean he has no trouble with lying to authority. Therefore, CW Vega's credibility and reliability were explored during his cross-examinations by more than one codefendant's attorney and the jury had abundant information from which to decide whether he testified truthfully about his identification of Idalia as the woman who sold crack to him.[19] For all of these reasons, the record

---

[19] Juan also makes a cursory statement that the trial judge erred by not allowing him to inquire about CW Vega's meetings with the prosecutors during his cross-examination of this witness and that this inquiry would have resulted in a successful impeachment of Vega's testimony. As the government points out, however, Juan's contention on this matter is waived for his failure to flesh out the argument. See Chan, 981 F.3d at 50 n.4 (citing Rodríguez v. Mun. of San Juan, 659 F.3d 168, 175 (1st Cir. 2011) ("[W]e deem waived claims not made or claims adverted to in a cursory fashion, unaccompanied by developed argument.")). And as we have just

- 51 -

shows the trial judge gave Idalia plenty of leeway to impeach CW Vega's identification of Idalia as one of the people from whom he bought crack. The reasonable limitations she placed on the scope of the cross-examination were not an abuse of discretion. See Casey, 825 F.3d at 24.

Sergeant Rivera Vélez<br>(Juan)

We turn now to Juan's complaint that the trial judge did not allow him to explore, during cross-examination, a meeting a trial witness had with the prosecutors during a court recess after the witness had started testifying. Puerto Rico Police Sergeant Luis Rivera Vélez was the first witness to testify at the trial. After a couple of days of testimony, the government disclosed to the trial judge, outside the presence of the jury, that it had met with this witness the morning of his second day of testimony to review and cut down the number of exhibits the government was admitting into evidence through him. Apparently there was some confusion on the government's part about whether it had been allowed to meet with its witness in the middle of his direct testimony. But after hearing the government's disclosure and explanation for what happened, the trial judge ultimately decided the government and the witness had genuinely misunderstood the

---

written, the trial judge did not abuse her discretion when she did not allow this line of inquiry during the defendants' respective cross-examinations of this witness.

court's instructions and had not violated a court order when they met to discuss the trial exhibits.

During Juan's cross-examination of Sergeant Rivera, the trial judge interrupted his inquiry about whether the sergeant recalled the trial judge's instruction during the first day of testimony about not discussing the testimony with anyone. During a conversation at side bar, the trial judge admonished Juan's counsel for his attempt to impeach the witness based on an event that had been discussed, researched, and determined to have been the result of some confusion on the part of the government's attorneys and not of misconduct on the part of either the government or the witness. The trial judge ruled that, absent some indication that the witness had met with the government after the discussion following the government's own admission about the misunderstanding, Juan's counsel could not exploit the early misunderstanding as part of his attempt to impeach the witness's credibility.

Juan frames his complaint about the limitation on the scope of cross-examination as a violation of his right to confront Sergeant Rivera. Without citing any case law, Juan asserts the cross-examination would have been relevant to show the witness had a tendency to ignore the law, including the trial judge's explicit instructions. The government responds that Sergeant Rivera was not at fault for meeting with the government mid-testimony because,

as the trial judge explicitly found, he had been guided by the government's misunderstanding of the rules.  The government also argues -- and the transcripts confirm -- that Juan and his codefendants were permitted to cross-examine Sergeant Rivera at length about various topics discussed during the direct examination.

After reviewing the testimony and discussion around this testimony, it is clear Juan had a full opportunity to cross-examine this witness and that the trial judge placed a reasonable and permissible limitation on the scope of Juan's cross-examination. We perceive no abuse of discretion here either.  See Casey, 825 F.3d at 24.

### Other witnesses
### (Joel and Carlos)

Joel argues (and Carlos joins) his confrontation rights were infringed when the trial judge limited the scope of cross-examination and/or re-cross-examination for five of the government's witnesses.  Joel contends the limitations improperly prevented him and his codefendants from developing their defense theory that other drug points were operating in the same area where they were accused of operating.  Joel provides five examples of where he tried, during cross-examination, to elicit information

about how other organizations' drugs were packaged but the trial judge cut it off as irrelevant and collateral.

The government picks apart these five examples by pointing out that the defendants did in fact have the opportunity to cross-examine the witnesses they now claim they were precluded from questioning. Moreover, the government argues there were several witnesses who did testify about different drug packaging types and colors and, ultimately, that the jury got to hear the defendants' theory about more than one drug enterprise operating out of the same areas. A review of the trial transcripts supports the government's assertions here. Even when the trial judge sustained an objection from the government after Joel or a codefendant asked a specific question about other drug points or drug packaging details, the government asserts -- and the record shows -- that the defense got its main point across.[20] This

---

[20] The trial judge did sustain several objections during cross-examination and re-cross-examination about the details of other possible drug points at or around Los Claveles as beyond the scope of the direct or re-direct examination and such is a valid reason to sustain the objection. See United States v. Weekes, 611 F.3d 68, 70 (1st Cir. 2010) (Souter, J.) (holding no abuse of discretion when defendant was not allowed to cross-examine a witness about a matter outside the scope of the witness's direct testimony but other witnesses were questioned about that matter); United States v. Kenrick, 221 F.3d 19, 33 (1st Cir. 2000) (en banc) (acknowledging district court's "'extensive discretion' in controlling re-cross-examination"), abrogated on other grounds by Loughrin v. United States, 573 U.S. 351 (2014).

particular drug trafficking enterprise on trial was not the only game in town.

As we stated above, "the district court wields considerable discretion to impose 'reasonable limits' on cross-examination." Casey, 825 F.3d at 24 (quoting Raymond, 697 F.3d at 39-40). Reviewing de novo whether Joel and the other defendants were given a reasonable opportunity to question each of the witnesses discussed in Joel's brief and the limitations on the scope of the cross or re-cross for abuse of discretion, we see the transcripts are replete with examples of these witnesses acknowledging other drug points operated by different people in areas similar to where the defendants before us were accused of operating their drug trafficking business. See id. In addition, we see no abuse of the trial judge's discretion to limit the scope of their cross-examination and re-cross-examination of these witnesses.

### Excluded defense witnesses
(Juan)

Juan challenges the trial judge's decision not to allow him to present witnesses to impeach certain testimony offered by CW Ferrer. To place Juan's challenge in context, here is the short version of what happened at trial. CW Ferrer testified (among many other topics) about his drug addiction and that he supported his drug addiction by "selling drugs; sometimes my grandma would

give me some money, and, well, I would just hustle around. And I had a legal job." When another defense counsel explored the details of the "legal job" during cross-examination, CW Ferrer testified that he had worked at a restaurant and as a security guard. Juan eventually attempted to bring in witnesses whose proffered testimony was to prove CW Ferrer had not worked at two of the locations at which he claimed to have been employed in 2006 and 2008. Citing impermissible character evidence and collateral impeachment, the government objected. After considering Juan's proffer, the trial judge concluded these witnesses would not be allowed to testify. Their testimonies, she reasoned, fell squarely within the rule against impeachment by collateral evidence, had no other relevance or probative value, and would not have been material to the guilt or innocence of any defendant.

Before us, Juan challenges those conclusions and argues he should have been allowed to call those witnesses who could expose Ferrer's lies about his work history -- lies designed to minimize this CW's role in the conspiracy and hide the fact that he was -- in Juan's words -- a "major drug trafficker" for the organization. For its part, the government countered that Juan's proffered evidence would have been "the very definition of collateral." We agree.

"A matter is collateral if 'the matter itself is not relevant in the litigation to establish a fact of consequence,

i.e., not relevant for a purpose other than mere contradiction of the in-court testimony of the witness.'" United States v. Marino, 277 F.3d 11, 24 (1st Cir. 2002) (quoting United States v. Beauchamp, 986 F.2d 1, 4 (1st Cir. 1993)). In general, a party may not present extrinsic evidence for the sole purpose of impeaching a witness on a collateral matter. Id. The decision on whether a matter is collateral or material is within the district court's discretion. United States v. DeCologero, 530 F.3d 36, 60 (1st Cir. 2008). Like the trial judge, we fail to see how CW Ferrer's employment contemporaneous with his participation in a drug distribution conspiracy has any bearing on the issue of Juan's own culpability in that same conspiracy.[21]

Moreover, as Juan admits, he was allowed to and in fact did cross-examine CW Ferrer about the witness's employment history. In sum, the trial judge did not abuse her discretion when she precluded Juan's proffered impeachment witnesses from testifying.

---

[21] Juan tries to carve a space for his excluded witnesses by arguing that the truthfulness of CW Ferrer's statement regarding his "legal job" became a legitimate issue to explore as soon as CW Ferrer testified on direct, in response to the government's questions, to this employment history. The government, however, eliminates that space when it points out that CW Ferrer stated he paid for his drugs by selling drugs and holding a "legal job" but that the prosecutor did not ask any follow-up questions about his "legal job," only his selling activity. The government states -- and this is supported by the trial transcripts -- that CW Ferrer only stated details of these "legal jobs" after he was asked about them on cross-examination.

## Repetitive testimony
(Joel & Carlos)

In Joel and Carlos's final evidentiary issue, they contend the trial lasted 128 days in part because the trial judge allowed the government to present needlessly long and repetitive testimony about a few specific events, unearthed during the investigation, which ultimately had an unduly prejudicial effect on them in violation of Federal Rule of Evidence 403.[22] Joel (joined by Carlos) provides three examples:

- Five law enforcement agents testified about the same surveillance day which yielded a military box with drugs inside and a video taken of Joel yelling "snitch you are going to die" to an unidentified listener.
- Five law enforcement agents testified about the discovery of the gun in Joel's father's car the day that Joel was pulled over.
- Four agents testified about a shooting incident on the basketball court in Villa Margarita in which Joel got shot in the arm and went to the hospital.[23]

---

[22] Federal Rule of Evidence 403 says "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of [among other reasons] needlessly presenting cumulative evidence."

[23] In considering Carlos's argument here, we note Joel presents only conclusory arguments about the repetitive or cumulative nature of the bulk of the testimony at issue. He provides lists of transcript pages for the witnesses he asserts provided the cumulative testimony for each incident, but he doesn't describe how the various testimonies are repetitive to the point of substantially outweighing their probative value. He also does not refer us to any case precedent in which we found a Rule 403 error where a few witnesses have testified about the same event and the district court declined to strike or disallow the testimony.

In response, the government, siding with the trial judge's reasoning, says the testimony about these events was not needlessly repetitive or cumulative just because more than one witness testified about the same event since each witness added a different part or perspective of the incident. Each witness here challenged as needlessly cumulative was in fact needed to share either different personal observations or vantage points of the incident in question or to testify to a distinct temporal part of the day the event occurred.

"Evidence is cumulative if repetitive, and if 'the small increment of probability it adds may not warrant the time spent in introducing it.'" Elwood v. Pina, 815 F.2d 173, 178 (1st Cir. 1987) (quoting 1 Weinstein's Evidence ¶ 401[07] at 401-47-48 (1985)). Rule 403 allows a trial judge "to 'exclude relevant evidence if its probative value is substantially outweighed by a danger of' certain pitfalls, including . . . 'needlessly presenting cumulative evidence.'" United States v. Mehanna, 735 F.3d 32, 59 (1st Cir. 2013) (quoting Fed. R. Evid. 403). Abuse of discretion guides our review of the district court's Rule 403 determination.[24]

---

[24] The government suggests our review of the supposedly cumulative testimony about the shooting incident on the basketball court should be for plain error because Joel did not object to the various law enforcement agent testimonies regarding this incident on a Rule 403 basis. Because the trial judge recognized Joel's standing objection throughout the trial to repetitive or cumulative evidence and because we find no abuse of discretion in allowing each of the witnesses Joel mentions to testify about the

United States v. Dudley, 804 F.3d 506, 515 (1st Cir. 2015).  "An abuse of discretion showing is not an easy one to make.  We afford deference to the district court's weighing of probative value versus unfair effect, only in 'extraordinarily compelling circumstances' reversing that 'on-the-spot judgment' from 'the vista of a cold appellate record.'"  United States v. DiRosa, 761 F.3d 144, 154 (1st Cir. 2014) (quoting United States v. Doe, 741 F.3d 217, 229 (1st Cir. 2013)).  In doing so, we acknowledge the trial judge's "better position to assess the admissibility of the evidence in the context of the particular case before it."  Mehanna, 735 F.3d at 59 (quoting Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 387 (2008)).

There is no debate that the trial judge has "considerable latitude in Rule 403 rulings."  United States v. King, 827 F.2d 864, 867 (1st Cir. 1987).  And it is true, as Carlos points out, that we have previously upheld a district court's decision to exclude cumulative evidence on Rule 403 grounds as an appropriate discretionary call.  See id.  But such an exclusionary call did not happen here -- just the opposite -- so saying we've upheld discretionary exclusionary rulings in the past without adequately explaining why it was error here to allow the evidence is not

events Joel raises here, we do not conduct a separate plain error analysis for the overruled objections during the testimony about the shooting incidents.

helpful to Carlos's cause.  We have surveyed the testimonies Joel contests and as in other cases we have examined, we find that "[a]lthough [defendants] can point to instances in which the same story was told more than once, such repetition" here "encompassed new and relevant details."  United States v. Muñoz-Franco, 487 F.3d 25, 67 (1st Cir. 2007).  Additionally, Carlos fails to show prejudice.  See id. (noting "no indication" that "the arguably cumulative nature of the evidence affected the outcome of the trial in any way").  To whatever extent the testimonies from witnesses overlapped, the trial judge did not abuse her discretion by allowing each of the witnesses, who added to the story, to testify over Joel's cumulative evidence objection.

With that conclusion, we move on to the next set of issues.

**UNFAIR TRIAL**
(Joel, Carlos, Juan, Idalia)

Four defendants assert they were denied a fair trial for several reasons and because of purported errors by the trial judge.[25]  They claim they had to contend with:

- a biased and prejudiced jury,

---

[25] Carlos mentions the denial of due process in his broad summary of his arguments, asserting the bias of the trial judge and the lack of access to daily trial transcripts denied him due process, but he does not flesh out an argument about how his due process rights were implicated here.  Similarly, Joel makes a one phrase claim that the "multiple errors" throughout the trial "deprived [him] of his constitutional due process right to a fair trial" but doesn't develop any argument about due process per se.

- a biased trial judge, and
- a series of improper prosecutorial tactics.[26]

We'll delve into each of these arguments in turn, first setting the scene for each claim.

### Jury bias

Joel, Carlos, Juan, and Idalia each argue there was at least one incident during the trial that either 1) showed the jury was biased against them or 2) caused the jury to be biased against them and their codefendants. Premise one is based upon two separate notes written to the trial judge during trial. Premise two arises from one juror's disclosure that he had recognized one of the law enforcement witnesses. Before sifting through the details of what happened at trial, we first spell out some general principles that guide our thinking.

"'All would agree that an impartial jury is an integral component of a fair trial' and must be 'jealously safeguarded.'" Sampson v. United States, 724 F.3d 150, 160 (1st Cir. 2013) (alteration adopted) (quoting Neron v. Tierney, 841 F.2d 1197, 1200-01 (1st Cir. 1988)). That said, "[a] district court has broad, though not unlimited, discretion to determine the extent

Accordingly, our discussion in this section goes with their primary framing of this issue as whether either were denied a fair trial in any of the ways they argue to us.

[26] The defendants add to this fair trial grievance list the variety of evidentiary challenges we have already discussed and rejected.

and nature of its inquiry into allegations of juror bias." United States v. Corbin, 590 F.2d 398, 400 (1st Cir. 1979) (citations omitted).  We review the trial judge's approach and resolution to allegations of jury bias for abuse of discretion.  United States v. Ramírez-Rivera, 800 F.3d 1, 38 (1st Cir. 2015).

"[D]efendants seeking to establish juror misconduct bear an initial burden only of coming forward with a 'colorable or plausible' claim."  United States v. French, 904 F.3d 111, 117 (1st Cir. 2018) (French I) (quoting United States v. Zimny, 846 F.3d 458, 464 (1st Cir. 2017)).  "Once defendants have met this burden, an 'unflagging duty' falls to the district court to investigate the claim."  Id. (quoting Zimny, 846 F.3d at 464). "The type of investigation the district court chooses to conduct is within the district court's discretion; it may hold a formal evidentiary hearing, but depending on the circumstances, such a hearing may not be required."  Id. (citing Zimny, 846 F.3d at 465); see also United States v. French, 977 F.3d 114, 122 (1st Cir. 2020) (French II) (referring to a "formal evidentiary hearing" as "the gold standard for an inquiry into alleged juror misconduct" but reaffirming that "a full evidentiary proceeding in response to an allegation of juror bias" is "not required")).  "[T]he court's primary obligation is to fashion a responsible procedure for ascertaining whether misconduct actually occurred and if so,

whether it was prejudicial."  French I, 904 F.3d at 117 (quoting

Zimny, 846 F.3d at 465).

> So long as the district judge erects, and employs, a
> suitable framework for investigating the allegation and
> gauging its effects, and thereafter spells out her
> findings with adequate specificity to permit informed
> appellate review, the court's "determination . . .
> deserves great respect and . . . should not be disturbed
> in the absence of a patent abuse of discretion."

French II, 977 F.3d at 122 (brackets omitted) (quoting United

States v. Boylan, 898 F.2d 230, 258 (1st Cir. 1990)).

## Notes from jurors
### (Idalia, Juan, Carlos, Joel)

Idalia argues that two notes from the jury sent to the

judge during trial make evident she did not receive a fair trial

because these notes showed juror bias and the trial judge did not

adequately examine or consider these bias indicators when brought

to her attention.[27]  We'll start by telling you what these notes

were about and how the trial judge responded to them.

A couple of weeks into the trial, the judge received a

note from one juror, who wrote that she felt "uncomfortable with

---

[27] Joel, Carlos, and Juan also mention these jury notes in their briefs as part of their broader arguments about the ways in which they claim they were denied a fair trial, but other than asserting the trial judge failed to adequately inquire and/or examine the extent of the jurors' prejudice against them, they do not develop their argument as much as Idalia, so we focus on her take of this issue.  In fact, Carlos and Juan do not provide any argument about why these notes or the trial judge's manner of addressing them should disturb the guilty verdicts against them, so they have waived this particular issue.

the intimidating looks" from Joel's attorney and Carlos's attorney. Idalia's attorney asked the trial judge to excuse this juror, which the judge declined to do, explaining it would be like punishing the juror for bringing a concern to the attention of the court. The judge discussed how to phrase the response to the juror with the attorneys but stated she would not hold a hearing to ask the juror whether the juror had shared the concerns with other jurors or whether the juror's concerns were affecting the evaluation of the evidence unless the same concern was raised again. The judge provided the attorneys with an opportunity to object to the wording of her response, but after the attorneys spoke with their respective clients about the proposed response, everyone agreed to the trial judge's wording without further ado. The response returned to the juror read:

> I have received your note and discussed it with counsel. Regarding atty. Milanés and atty Burgos their response to your note is that they meant no disrespect to you and neither had nor have any intention to intimidate you. If there is any instance in which you need to address the court, feel free to do that.

There was a brief discussion about whether to admonish the juror not to discuss this concern with any other juror, but the trial judge decided she did not want to assume the juror had already spoken about it and did not want to discourage bringing these kinds of concerns to the court's attention. The trial judge

also reminded Joel's attorney not to look at the jury when he questioned witnesses, as had apparently been his trend so far.

The trial judge received the second note at issue at the end of the first day of closing arguments after the court session had ended. The jury had collectively sent a note asking if the judge could ensure they left the courthouse before the defendants and the defendants' family members "in order to avoid any encounters which are occurring on a daily basis." The trial judge responded to the note asking the jury to "advise to which defendants you are referring to when you mention encounters that are occurring on a daily basis." The jury replied it was referring to Suanette and Idalia and their family members. When the trial judge discussed the notes with counsel, Idalia's attorney expressed concern that this note meant the jury was biased against the defendants. She did not, however, request a hearing to further explore the jurors' request. The trial judge remarked that counsel was reading more into the note than what the jury had actually written and reminded all the attorneys that their clients were entitled to a fair trial but not a perfect one. The trial then continued with closing arguments.

Idalia filed a written motion for reconsideration, again expressing her concern about the ability of the jury to be impartial and asking the trial judge to conduct further inquiry into the jury note. And depending on how the jurors responded,

Idalia sought to poll each juror to assess whether anyone's impartiality had been compromised. The judge denied the motion in a written order, stating the jury had not referred to any specific incidents with the defendants and had simply asked to be allowed to leave the courthouse at the end of the day ahead of the defendants. The judge wrote: "There is no reason to read into this request the concerns of bias and lack of impartiality by the jurors that the two defendants are injecting into it. Nor have jurors voiced any concerns for their safety whatsoever."

On appeal, Idalia states the trial judge abused her discretion by not conducting a deeper inquiry into the jury's concerns expressed in these two notes, resulting in a verdict against her rendered by a partial jury. The government counters that the trial judge responded appropriately to each note. As for the note about the intimidating looks from two attorneys, the government is skeptical that the note could have implied any prejudice to Idalia because, importantly, her attorney wasn't one of the two mentioned. With respect to the note requesting a head start out of the building at the end of each day, the government argues the trial judge responded promptly to find out to which defendants the note referred and that Idalia has not provided any reason to doubt the judge's conclusion that the jury had not been tainted by their encounters with Idalia and Suanette as they left the building.

We agree with the government that there is no indication the trial judge abused her discretion when she denied Idalia's requests for hearings to further inquire about the two notes submitted by the jury.[28]  See French I, 904 F.3d at 117.  The record shows the trial judge brought the jury's respective concerns to the defendants as soon as was possible, carefully considered the best response, and allowed the defendants and their counsel to assist with the responses.  Given the trial judge's wide discretion to decide how to investigate a defendant's concerns about jury bias, we conclude her response to the defendants' concerns was both reasonable and appropriately measured.  We espy no error and move on to the next argument about jury bias.

Basketball
(Joel)

Two months into trial, one of the jurors submitted a written note to the trial judge, telling her he recognized a witness who had testified the day before as one of the men with whom he played in the same regular pick-up basketball games.  The juror wrote the note to bring his recognition of the witness to the trial judge's attention and to raise a concern that other

---

[28] The government makes no waiver argument as to either note so we proceed to resolve these juror note issues on the merits.

players in the basketball league may be witnesses because he understood many of the players were involved in law enforcement.

The trial judge brought the juror into the courtroom to explore on the record this juror's connection to the witness. In response to the trial judge's questions, he indicated he'd been playing in this over-35 league for about a year. Twice a week or so he showed up at the court -- located behind the police station in Trujillo Alto -- and played with and against whomever else showed up that night as well. The juror told the trial judge he'd played with this witness five to ten times total but didn't know him personally and had never discussed this case with him or any other police officer. The juror hadn't recognized the witness's name when it was read as a part of a list of witnesses during voir dire because, as he told the judge, he didn't know any of the other players personally and couldn't provide anyone's full name. When the witness in question took the stand the day before, however, the juror recognized him. He didn't alert the court immediately because he didn't know how to do so during open court. Instead, he told the court security officer at the end of the day who suggested the juror write the note that made its way to the trial judge.

The trial judge concluded neither the juror nor the witness engaged in any misconduct and the juror had an adequate explanation about how he brought the issue to the trial judge's

attention.  The trial judge denied the defendants' request to excuse the juror because she concluded the proper remedy was to instruct the juror not to play basketball with this group until the trial was over rather than dismiss him from the jury.

The next day, the judge called the juror back for another conversation at the bench.  She asked the juror whether he would give more weight or credibility to the police officer's testimony because they had played basketball together.  The juror said no because he doesn't know anything about the witness other than what he had seen on the basketball court and had no reason to give more weight to his testimony than to another witness based on the experiences on the basketball court.  Following this exchange, the juror departed the courtroom and the trial judge invited further comment from all counsel.  The prosecutor declined and counsel for Joel, Carlos, and Juan raised no additional demur.

Now before us, Joel argues the trial judge abused her discretion by refusing to dismiss this juror.  Joel says the juror's "failure to inform" the court that he played basketball with police officers "reflected bias in favo[r] of the police with whom he played every week."[29]

---

[29] Carlos states in his brief that he joins Joel's argument on this issue, but he does not provide any independent or additional argument.  We pause for a moment to remind the defendants -- many of whom joined in various arguments by their codefendants -- that they cannot simply state a blanket intention to join another's argument and leave it at that.  Adoption by

The government argues the trial judge did not abuse her discretion when she denied the defendants' request to dismiss the juror because the issue was brought promptly to her attention, she conducted an in-depth inquiry into the connection between the juror and the witness, and appropriately concluded the juror was not biased by his "casual" connection to this witness.

We can agree with Joel on one point: a "juror's interpersonal relationships" are an important factor to consider. But this situation is a far cry from the case Joel cites in support of his argument. In French I, a defense counsel learned after the conviction and sentencing of his client for marijuana production and distribution conspiracy that one of the jurors had lied on her jury questionnaire and during voir dire when she had not disclosed that her son had been convicted a few times of offenses related to his use and distribution of marijuana and cocaine. 904 F.3d at 114-15. The trial judge denied the codefendants' motion for a new

reference can be a risky move because it is well-known that it "cannot occur in a vacuum and the arguments must actually be transferable from the proponent's to the adopter's case." United States v. Brown, 669 F.3d 10, 16 n.5 (1st Cir. 2012) (citing Casas, 425 F.3d at 30 n.2). A statement of intention to join another's argument without providing any independent argument about the issue whatsoever will often result in waiver. See id.

Juan, for his part, includes this incident as part of a list of reasons why he did not receive a fair trial from an impartial jury but doesn't provide any developed argument around this incident in particular.

Both Carlos and Juan have therefore waived this particular issue. See id.; Chan, 981 F.3d at 50 n.4.

trial and request for an evidentiary hearing, but we reversed and remanded after holding that an investigation into the juror's misconduct had been warranted. Id. at 116, 120. The defendants appealed again when upon remand the judge again denied their motion for a new trial following an evidentiary hearing to determine whether the juror had in fact engaged in misconduct and whether the misconduct, if any, was prejudicial to the defendant. French II, 977 F.3d at 121-22. We affirmed the district court's denial, rejecting the defendants' arguments that the court's investigation had not been thorough or structured enough. Id. at 122. We also stated that "'[t]he touchstone' of our appellate review is 'reasonableness.'" Id. at 122 (quoting United States v. Paniagua-Ramos, 251 F.3d 242, 249 (1st Cir. 2001)).

Here, the juror's misconduct, as the defendants see it, was not disclosing his basketball-playing activities and not recognizing the name of one of the witnesses as one of the players who plays in the informal, pick-up basketball games during voir dire. But after the juror notified the trial judge that he had recognized the witness on the stand, the trial judge immediately questioned the juror, at length, twice. The trial judge was reasonably satisfied that the juror credibly denied having any personal relationship with the witness, and that he had not intentionally misled the court during voir dire. Also reasonable was the trial judge's determination that the juror was not going

to favor the witness's testimony because of the time he had spent with the witness playing basketball.  The trial judge's actions and decisions here do not reflect any abuse in her exercise of the wide discretion she had to decide how to investigate a claim of juror misconduct.  See French I, 904 F.3d at 117.

Next up:  the third and final claim of jury bias.

### Knowing some defendants were detained
(Joel & Carlos)

Three times during the trial, the defendants raised concerns to the trial judge that the jurors had either seen them in handcuffs or deduced some of them were detained pending the outcome of the trial based on a newspaper article published during the trial.  We describe each incident before getting into the arguments Joel and Carlos make about why the trial judge didn't address each appropriately.

Incident number 1 - whether some jurors saw some defendants handcuffed in the courthouse elevator:  one mid-trial day (in September 2015), as the jurors left the courtroom, they may have caught sight of some defendants, in handcuffs, in an elevator on their way to the courthouse cell block.  The defendants asked the trial judge to ask the jurors about what they saw and to declare a mistrial if warranted.  The judge ultimately did not question the jurors, but she held an evidentiary hearing at which she heard testimony from four of the defendants about this

encounter and she considered video evidence from the courthouse hallways which captured the juror's movements with respect to the defendants' positions in the elevator.

After the hearing, the trial judge determined that if any of the jurors saw the defendants in handcuffs, it was for a brief moment only and, regardless, "none of the jurors exchanged looks with the defendants." She concluded the encounter did not warrant a mistrial because this was not a happenstance in which the jurors had seen the defendants shackled or gagged. She compared the quick glance one juror made in the direction of the elevator (which she observed in the video) to the quick glimpses the jurors had caught in United States v. Ayres, in which we held that a "quick glimpse once or twice of the defendants in handcuffs out of court . . . would hardly dilute their presumption of innocence" because a moment's view of defendants in handcuffs is far different from cases in which the jurors saw a defendant shackled for longer periods of time or were "repeatedly reminded of the defendants' confinement." 725 F.2d 806, 812-13 (1st Cir. 1984).

Incident number 2 - whether some jurors saw defendants handcuffed in the courtroom: near the end of trial (in December 2015), during a lunchtime recess, the courtroom door was ajar for some moments when a trial spectator left the courtroom while some defendants were in handcuffs in the courtroom and the jury was

walking in the hallway past the courtroom door. The defendants requested a mistrial. The trial judge held a hearing, heard the defendants' versions of events, considered courtroom security video footage, then concluded none of the jurors could have seen inside the courtroom for more than "a matter of seconds" and "[n]o reasonable minded person who view[ed] the videos in an impartial manner could conclude" the jurors saw the defendants handcuffed. The defendants also tried to provide the trial judge with photographic and videographic evidence that purported to reenact the scene, but the trial judge refused to consider these reenactments and ultimately denied the motion for mistrial.

Incident number 3 - whether the jurors read a newspaper article from which they might have deduced some of the defendants in their trial were detained: also towards the end of trial, an article published in a local newspaper disclosed that two drug trials had been suspended by the court for a few days after a gastroenteritis virus started spreading through the detention center where many defendants in those trials were being held. Joel and Carlos filed a motion for a hearing to determine whether a mistrial would be required and asked that the trial judge poll the jurors to find out whether they had seen the article and inferred from it that Joel and Carlos were two of the defendants referred to in the article. The judge denied the motion because the article had not named the cases or the defendants involved, rendering Joel

and Carlos's concerns too speculative. She also commented that Joel and Carlos's concern over the potential release of their identities was not completely credible because they had filed a motion two days later on the public docket of their case complaining about the conditions of the detention center in which they were being held. The trial judge also distinguished a juror's knowledge of a defendant's detention from a juror seeing a defendant shackled and handcuffed in a courtroom, which she concluded had not occurred.

The denial of a motion for mistrial is reviewed for abuse of discretion. Gonsalves, 859 F.3d at 107. As we indicated above, "[c]onducting an inquiry into a colorable question of jury taint is a delicate matter, and there is no pat procedure for such an inquiry." United States v. Bradshaw, 281 F.3d 278, 290 (1st Cir. 2002) (citing Evans v. Young, 854 F.2d 1081, 1083-84 (7th Cir. 1988)). "[T]he trial court has wide discretion to fashion an appropriate procedure for assessing whether the jury has been exposed to substantively damaging information, and if so, whether cognizable prejudice is an inevitable and ineradicable concomitant of that exposure." Id.

Joel and Carlos argue to us that the trial judge was wrong not to ask the jurors whether they saw defendants handcuffed and, if so, what and who they saw, as well as whether they had

seen the newspaper article.[30]  We note, however, that, in response to both courthouse incidents, the trial judge conducted an evidentiary hearing to investigate whether the jury could have seen or did see the defendants in handcuffs.  This, as we earlier noted, is "the gold standard" for an inquiry into an incident that could create or lead to juror bias.  French II, 977 F.3d at 122.  While the trial judge did not bring jurors in to question them, she did consider testimony from the defendants as well as photographs and/or video footage from courthouse security cameras and provided detailed written summaries about what the defendants told her during the hearing and what she found after reviewing the videos.

The defendants do not claim the trial judge was clearly wrong with any of her factual determinations after the hearings -- the standard of review we would apply to her findings.  See Bradshaw, 281 F.3d at 291 ("[W]e accept the trial court's factual findings only to the extent that they are not clearly erroneous." (citation omitted)).  Instead, they insist she needed to make a

---

[30] Idalia also mentions, in a footnote, the defendants' collective request for a mistrial after members of the jury saw the defendants in handcuffs, which the trial judge denied.  Idalia does not make any argument that the denial of the motion for mistrial was in error, so we will not undertake a review of this ruling on her behalf.  Juan, for his part, also lumps these events into his list of reasons why he did not receive a fair trial from an impartial jury but once again doesn't provide any developed argument around this incident in particular.

direct inquiry to the jurors to find out what they saw. The government counters that she conducted an appropriate inquiry into these two incidents and her findings are unassailable.

True, the trial judge, in her written orders explaining the denial of the motions for mistrial, did not expressly address the defendants' requests to question the members of the jury. However, her written "statements of reasons" indicate and demonstrate her detailed consideration about whether the jurors could have seen the defendants during the two incidents. In other words, she answered the question of whether the jury had possibly viewed the defendants in cuffs another way. That she did not bring jurors in for questioning was not an abuse of her discretion to determine how to investigate these possible sources of bias. See Bradshaw, 281 F.3d at 290.[31]

Turning our attention briefly to the newspaper article, the trial judge also did not err by choosing not to ask the jurors about whether they had read it. As the government argues, if the jurors read the article, then, at worst, they may have inferred that a defendant in this trial was being detained, but mere awareness that one or more defendants were detained during the

---

[31] To be sure, "[c]are should be taken whenever reasonably possible to prevent the jurors from viewing a defendant handcuffed while the defendant is on trial. In the absence of a showing of prejudice, however, a fleeting glance by jurors of a defendant outside the courtroom in handcuffs does not justify a new trial." Ayres, 725 F.2d at 813.

trial is not sufficiently prejudicial to require a mistrial.  See Ayres, 725 F.2d at 812-13; see also United States v. Deandrade, 600 F.3d 115, 119 (2d Cir. 2010) ("[A] brief and fleeting comment on the defendant's incarceration during trial, without more, does not impair the presumption of innocence to such an extent that a mistrial is required.").  Asking the jurors one-by-one whether they saw it would have only served to tip them off that the article existed.

All in all, there was no hint the trial judge abused her discretion when she investigated and addressed the defendants' various jury bias concerns.

**Judicial Bias**
(Joel & Carlos)

We now turn our attention to whether the trial judge showed bias against some of the defendants' trial attorneys. Several times throughout the trial, the judge admonished some of the defense counsel's behavior in open court, whether for laughing, talking, or otherwise disrupting or interrupting the proceedings. Several times, counsel brought concerns to the court that she was treating them differently than the government's attorneys to the detriment of the defendants.  Joel and Carlos now contend her bias toward their trial attorneys resulted in an unfair trial.

For example, in September 2014, Carlos's trial counsel filed a miscellaneous motion asking the trial judge to note his

concern that her tone and demeanor (including facial expressions and looks reflecting "impatience, annoyance, and ire") with and towards him was markedly different from the way she treated the government's attorneys and could be interpreted by the jury as "animosity" against the defense.  The trial judge noted counsel's "subjective perceptions" and concern in a written order entered on the docket stating she had needed to address the defense attorneys' "courtroom manners" outside the presence of the jury and repeating that she had had "no issues" with the defendants' courtroom behavior.  When the trial judge read her order into the record, she added:

> And I reaffirm, I have absolutely no partiality toward the Government or the defendants.  I have said the defendants have always displayed utmost respect. They have been exemplary in their behavior.  Unfortunately, their attorneys do not show the same respect for the [c]ourt that their clients do.  When you measure up to them, you won't need this, you won't need this kind of statement from the [c]ourt.  It is not the defendants; it is you.

A second example is from January 2015, when Carlos's trial counsel again raised a concern that the trial judge was treating him differently from the government's attorneys and asked her to declare a mistrial because her "rebuking tone, menacing looks and accompanying body language" towards him were not looked on favorably by the jury.  In the alternative, Carlos's counsel asked the judge to "refrain[] from engaging defense attorneys in that tone, with that body language, and that sort of look[]."  The

trial judge denied the oral motion, commenting that she had been working hard to ensure the trial was fair to the defendants but that some of the defendants' attorney's behavior had been less than exemplary. The trial judge stated she had no bias against any of the defendants and was explaining each of her evidentiary rulings in detail so that all the parties understood the decisions she was making throughout the trial.

A third example occurred in February 2015, when, in the middle of testimony on direct examination from a law enforcement officer, the trial judge said "Mr. Burgos" (Carlos's trial counsel's name) twice to get him to stop whatever he was doing at counsel table at the time. The testifying officer subsequently, and outside of the jury's presence, accused Mr. Burgos of making a disparaging remark -- calling the officer "smartass" while he was testifying. Mr. Burgos admitted to conferring with co-counsel during the witness's testimony but categorically denied making any remarks towards the witness. The trial judge took Mr. Burgos at his word but warned him that she would take further action if any other witnesses made a similar complaint about his courtroom behavior.

The trial transcripts are replete with examples of the trial judge commenting on Mr. Burgos's behavior. Several times throughout witness testimony, hearings held to address issues which arose during trial, and during bench conferences, the trial

judge asked Mr. Burgos (in addition to other attorneys) to stop laughing or otherwise disrupting what she and others were trying to listen to.

Before us, Carlos argues that the trial judge repeatedly mistreated Mr. Burgos in front of the jury, discrediting him several times throughout the trial, which served to deprive his client of a fair trial. Joel, who likewise voices fair trial concerns, acknowledges that, using the cold appellate record, it is hard to show the way in which the trial judge's looks and tone toward Mr. Burgos and some of the other attorneys prejudiced the defendants, but also argues the judge's attitude towards Mr. Burgos was clearly noted by the jury, which created prejudice against the defendants.

"When addressing allegations of judicial bias, we consider 'whether the comments were improper and, if so, whether the complaining party can show serious prejudice.'" United States v. Ayala-Vazquez, 751 F.3d 1, 24 (1st Cir. 2014) (quoting DeCologero, 530 F.3d at 56). "[W]e consider isolated incidents in light of the entire transcript so as to guard against magnification on appeal of instances which were of little importance in their setting." United States v. Espinal-Almeida, 699 F.3d 588, 607 (1st Cir. 2012) (brackets omitted) (quoting United States v. Ofray-Campos, 534 F.3d 1, 33 (1st Cir. 2008)). "Clearly a trial judge should be fair and impartial in her comments during a jury trial

because a fair trial in a fair tribunal is a basic requirement of due process." Id. (citing United States v. de la Cruz-Paulino, 61 F.3d 986, 997 (1st Cir. 1995)). "However, a finding of partiality should be reached only from an abiding impression left from a reading of the entire record." Id. (quoting de la Cruz-Paulino, 61 F.3d at 997). "And even an imperfect trial is not necessarily an unfair trial." Ayala-Vazquez, 751 F.3d at 24 (citing Espinal-Almeida, 699 F.3d at 608).

"As a general rule, a judge's mid-trial remarks critical of counsel are insufficient to sustain a claim of judicial bias or partiality against the client." Logue v. Dore, 103 F.3d 1040, 1046 (1st Cir. 1997) (citing Liteky v. United States, 510 U.S. 540, 555 (1994)). As in Logue, the comments and demeanor the defendants complain of here were interspersed throughout the trial, sometimes at sidebar or when the jury was not in the room and sometimes in the presence of the jury. "Statements that are made by a judge in the jury's presence are, of course, subjected to stricter scrutiny." Id. There were clearly several incidents where the trial judge admonished Mr. Burgos, both in and out of the presence of the jury. The incidents described above illustrate Carlos and Joel's general concerns. The record is clear that there was no love lost between Mr. Burgos and the trial judge. But, as the government points out, the direct reprimands and discussions regarding Mr. Burgos's courtroom behavior were mostly conducted

outside the presence of the jury.  We further note that this is not a situation in which the trial judge impermissibly hijacked witness questioning or made inappropriate commentary about any defendant or vouched for a witness's credibility.  See United States v. Raymundí-Hernández, 984 F.3d 127, 152-57 (1st Cir. 2020) (reversing convictions because the trial judge's comments during trial and sua sponte cross-examination-like questioning of a key defense witness indicated a pro-prosecution bias and likely affected the outcome of the trial).  Lastly, after reviewing the trial transcripts, we note that some of the trial judge's admonitions to Mr. Burgos may well have been justified by his courtroom behavior.

To the extent any of the trial judge's demeanor or commentary may have come close to crossing the line, we observe that her end-of-trial instructions to the jury addressed her reproaches to counsel:

> It is the duty of the [c]ourt to admonish an attorney, members of the jury, who out of zeal for his or her cause, does something which the [c]ourt deems is not in keeping with the rules of evidence or with the rules of procedure.  You are to draw no inference against the party represented by an attorney to whom an admonish [sic] of the [c]ourt was addressed during the trial of this case.

The government argues that if the jury perceived any animosity, it was cured by the trial judge's instruction to the jury.  We agree. "In assessing the impact of a judge's actions, jury

instructions can be a means of allaying potential prejudice." Logue, 103 F.3d at 1046-47. In our view, this instruction was "sufficient to palliate any untoward effects" from the trial judge's words, tone, or demeanor towards defendants' attorneys throughout the trial. Id. at 1047.

Examining the record as a whole, we conclude that the judge's statements on the record and demeanor in the courtroom did not indicate judicial partiality against the defendants or in favor of the government and "did not compromise the fundamental fairness of the proceedings." Logue, 103 F.3d at 1046; see also United States v. Rodríguez-Rivera, 473 F.3d 21, 28 (1st Cir. 2007).

### Prosecutors' tactics
(Joel & Carlos)

Joel (joined by Carlos) asserts the prosecutors engaged in several improper tactics throughout the trial, all of which (in their view) add to the pile of reasons how and why their trial was ultimately unfair. The government treats their arguments as alleging prosecutorial misconduct and while neither defendant specifically frames this issue in those precise terms, we agree that we should address the arguments using our well-established framework for reviewing claims of prosecutor misconduct. "We review preserved claims de novo and unpreserved claims for plain error." United States v. Rosario-Pérez, 957 F.3d 277, 299 (1st Cir. 2020) (citing United States v. Sepúlveda-Hernández, 752 F.3d

22, 31 (1st Cir. 2014)).  "Either way, we may first consider whether the government's conduct was, in fact, improper."  Id. (citing United States v. Duval, 496 F.3d 64, 78 (1st Cir. 2007)).  "If so, we will only reverse if the misconduct 'so poisoned the well that the trial's outcome was likely affected.'"  Id. (quoting United States v. Vázquez-Larrauri, 778 F.3d 276, 283 (1st Cir. 2015)).  "Four factors guide our analysis:  (1) the severity of the prosecutor's misconduct, including whether it was deliberate or accidental; (2) the context in which the misconduct occurred; (3) whether the judge gave curative instructions and the likely effect of such instructions; and (4) the strength of the evidence against the defendant."  Id. (quoting Vázquez-Larrauri, 778 F.3d at 283).

We briefly summarize the ways in which Joel and Carlos assert the prosecutors misbehaved throughout the trial.  We also provide the government's explanation about why and how each instance did not actually amount to misconduct by the prosecutors in this case.  To cut to the chase, our examination of each incident alleged by Joel and Carlos has not uncovered any misconduct on the part of the prosecutors.  Here's what's alleged:

- Allowing Sergeant Rivera to testify about the drug distribution activities of two codefendants who were not part of the trial when this witness did not have personal knowledge about these activities and was relying on what others had told him.  As the government points out (and the trial transcripts confirm), the basis for this witness's knowledge was revealed while he was on the stand and the prosecutor

admitted she was mistaken by her belief that he'd had personal knowledge about the activities of the two codefendants in question. In addition, the trial judge struck the testimony and instructed the jury that they were to disregard it.

- Speaking with Sergeant Rivera mid-testimony and refusing to turn over the reports from his interviews with the defendants so Joel wouldn't have the benefit of these reports to prepare his cross-examination. The government's misunderstanding regarding the trial judge's order not to meet with witnesses once their testimony had begun has already been examined supra. In response to Joel's accusation that the government withheld Rivera's reports from various interviews with witnesses, the government asserts the record clearly reflects that the reports Joel sought either did not exist because Rivera had not written them, or Joel acknowledged he had ultimately received the report. As the government argues, there is no indication of prosecutorial misconduct here either because the government complied with all the discovery orders.

- Referring to Joel as the operator of the drug trafficking organization with a few different witnesses. The government asserts -- and the trial transcripts show -- either the witness volunteered Joel's role as part of an answer to a question, the witness was testifying to Joel's own description of his role, or the prosecutor's question implying Joel was a leader was posed during the grand jury proceedings and only came out during the trial through proper memory refreshing for the particular witness. The government also shows us where the jury heard unchallenged testimony several times from witnesses that Joel was the leader of the enterprise.

- Asking CW Ferrer during re-direct examination about other defendants who had pled guilty. The government argues there was no misconduct when the government asked CW Ferrer about whether another codefendant had pled guilty because Joel had introduced this series of questions when, during his cross-examination, he started inquiring about how much jail time Ferrer had received upon his own guilty plea and whether other codefendants had also simply been sentenced to time served.

As we previewed above, our review of the record reveals each of these claims "lack[s] arguable merit" because none shows actual

prosecutorial misconduct.  See Rosario-Pérez, 957 F.3d at 299.

So, we do not explore them any further.[32]

---

[32] There are two more "unfair trial" arguments to bring to the reader's attention, each relegated to this footnote because neither is sufficiently developed for our review.  First, Carlos says he was unfairly disadvantaged during trial by not having access to daily trial transcripts.  He asserts the trial might have been shorter if he and his codefendants had access to daily transcripts because the length of the bench conferences and arguments over specific testimony would have been shorter if they had been able to consult the transcripts of the testimony they were arguing over.  During the trial, the judge granted a motion filed by Suanette -- joined by Carlos and other defendants -- for access to the transcripts the government had already ordered. Carlos asserts she gave him and his codefendants a hard time about their request for transcripts but there is no indication in the briefing or the discussion about Suanette's motion that the trial judge denied a request for daily transcripts.  And Carlos acknowledges that indigent defendants are not automatically entitled to free daily transcripts.  See 18 U.S.C. § 3006A. Instead, Carlos states that, in order to mount an "adequate defense," daily transcripts should be one of the entitlements included within a defendant's constitutional rights.  In the absence of a developed record or argument, however, all we can do is acknowledge this was one of the ways in which Carlos says there were cumulative errors in his trial requiring reversal and a combination of errors depriving him of a fair trial.

Second, Juan mentions "inhumane conditions" several times throughout the factual and procedural summary in his brief, mentioning the times he was feeling ill or was sleep deprived or had inadequate food, but he does not tie these claims to any of his arguments about how he was denied a fair trial or how or why these events would be a reason to vacate his convictions or warrant a new trial.  Carlos, in his brief, states that he "adopts" Juan's claims about "the documented and debilitating conditions of confinement" but also does not develop any argument on this topic. As the government asserts in response, these claims are therefore waived.  See Chan, 981 F.3d at 50 n.4.

## Cumulative error
(Joel, Carlos, Juan)

Joel, Carlos, and Juan also argue that the combined effect of the errors they say were made during trial (including the purported evidentiary errors and the ways in which they claim they were denied a fair trial) leads to the inescapable conclusion that they are entitled to a new trial. Joel's list of errors he claims add up to cumulative error include jury bias, judicial bias, improper prosecutorial tactics, evidentiary errors, and the denial of the motion to suppress the gun found in his father's car. Juan says the cumulative effect of the evidentiary errors he raised in addition to the list of ways he asserts (without explaining why) he was denied a fair trial will justify setting aside his convictions. Carlos, for his part, asserts the combination of the trial errors, including those related to jury bias, judicial bias, improper prosecutor tactics, evidentiary errors, and insufficient access to transcripts all deprived him of a fair trial.

When we are presented with a cumulative error argument, "[w]e review the rulings for abuse of discretion before deciding what cumulative effect any errors may have had." United States v. Centeno-González, 989 F.3d 36, 50 (1st Cir. 2021) (quoting United States v. Perez-Montañez, 202 F.3d 434, 439 (1st Cir. 2000)). "In doing so, we 'must consider each such claim against the background of the case as a whole, paying particular weight to factors such

as the nature and number of the errors committed; their interrelationship, if any . . . ; and the strength of the government's case.'"  Id. (ellipsis in original) (quoting Sepulveda, 15 F.3d at 1196).  Joel, Carlos, and Juan's cumulative error claims fail because we have not found any errors in any of the ways they contend they were denied a fair trial and the one potential evidentiary error (admitting the handwritten notations on the North Sight Communications business records) was harmless. See id. at 50.

And with that, we move on to the evidentiary sufficiency arguments.

**SUFFICIENCY OF THE EVIDENCE**

Suanette and Juan each argue they were entitled to judgments of acquittal on all the counts with which they were charged.  Recall Suanette was convicted of conspiracy to distribute narcotics as a seller and a facilitator as well as of aiding and abetting the distribution of marijuana.  Juan was charged with and convicted of two conspiracy counts (to distribute narcotics in the role of a "runner" and to possess firearms in furtherance of drug trafficking) and four aiding-and-abetting-drug-distribution counts (heroin, crack cocaine, powder cocaine, and marijuana). Both defendants moved for judgments of acquittal at the end of the government's presentation of evidence and again at the end of all

the defendants' presentations of evidence.  The trial judge denied both motions.

"Because the defendants made the same arguments before the district court (therefore preserving this legal issue for our review), our task is to consider afresh their arguments about why they say they are entitled to judgments of acquittal."  United States v. Chan, 981 F.3d 39, 51 (1st Cir. 2020).  "That is, we give no deference to the district court's assessment of the same arguments when it evaluated the defendants' motions for judgments of acquittal."  Id.  "To complete our review, we 'consider all the evidence, direct and circumstantial, in the light most favorable to the prosecution, draw all reasonable inferences consistent with the verdict, and avoid credibility judgments, to determine whether a rational jury could have found the defendants guilty beyond a reasonable doubt.'"  Id. at 55 (cleaned up) (quoting United States v. Negrón-Sostre, 790 F.3d 295, 307 (1st Cir. 2015)).  If we agree with the defendants that the trial judge erred when she denied their motions for judgments of acquittal, then we must order acquittal.  Montijo-Maysonet, 974 F.3d at 41 ("[T]he Double Jeopardy Clause precludes a second trial once the reviewing court has found the evidence legally insufficient." (quoting Burks v. United States, 437 U.S. 1, 18 (1978))).[33]

---

[33] We would usually tackle the sufficiency-of-the-evidence arguments at the front end of our opinion because successful

Suanette's and Juan's primary involvement in the drug trafficking organization were in two separate locations and the evidence of their respective roles came from different witnesses. So we'll address their challenges to the sufficiency of the evidence to support their convictions separately.

## Suanette's convictions

The testimony about Suanette's involvement in the drug trafficking organization came from two of the CWs we've encountered already: Lopez and Vega.[34] They each testified about their personal observations of Suanette providing sellers within the organization with baggies of marijuana as well as working side-by-side with her husband and codefendant Carlitos. CW Lopez testified that he was a drug addict who bought and sold marijuana and cocaine at the Villa Margarita "curve" on Amapola Street. In 2005 or 2006, CW Lopez watched the drug distribution hierarchy and process while he built a fence for Carlos (the defendant on appeal before us). Lopez

> could see the sellers when [Carlos] would give them their
> shifts, when he would give them material to sell. . . .

sufficiency challenges have double jeopardy implications, see Montijo-Maysonet, 974 F.3d at 41, but we cover these claims of error here in chronological order to the phase in which the trial judge ruled on these motions because only two of the five defendants raised these arguments before us and because we affirm the trial judge's denial of the motions for judgments of acquittal.

[34] A quick reminder that we are now reciting "our summary of the facts in the light most favorable to the jury's verdict." Chan, 981 F.3d at 45 (citing Charriez-Rolón, 923 F.3d at 47).

> [W]hen they finished working, they could come to the
> area in front of his house to do the tally, they would
> go to the carport in Joel's house, and there they would
> tally up. And anything regarding the drug point, well,
> [Carlos] was the man.

After CW Lopez finished building the fence, he became a lookout for the curve drug point, a "runner" (according to Lopez, that's someone who picked up money from clients, bought the drugs, then delivered the drugs back to the clients),[35] a direct seller, and a buyer. CW Lopez described the recharge process: when a seller ran low on product (whether heroin, cocaine, or marijuana), the seller would ask for a "recharge" through a handheld radio. Carlitos resupplied marijuana. CW Lopez testified he bought marijuana from Suanette at the drug point in Villa Margarita on Amapola Street from 2007 to 2008. According to CW Lopez, he did not observe Suanette resupply marijuana to the drug point, but "[she] always accompanied Carlitos when he was selling and she collected the money. If you went to buy, she would be the one collecting the money."

CW Vega testified he worked as a seller for the drug organization and sold marijuana from the abandoned house at the "curve." CW Vega often saw Carlitos in a truck and sometimes saw Suanette drive the same truck, especially when CW Vega had radioed Carlitos about needing to be resupplied because she often delivered

---

[35] Other folks add additional responsibilities to this "runner" job description, as we'll touch on later.

the next batch of marijuana in that truck after Joel had called CW Vega to tell him the new inventory was on its way. CW Vega said Suanette delivered around 80 baggies of marijuana around 7:30 a.m. four times a week in 2007 and the beginning of 2008. CW Vega also testified he did not see Suanette sell marijuana to customers at the drug point, but he paid her for the resupply by handing money to the lookout on duty who gave the money to Suanette.

The trial judge denied Suanette's first motion for judgment of acquittal in a written order, explaining that Suanette's assistance to her husband Carlitos at the drug point, her interaction as seller to CW Lopez, and her role as resupplier for Vega was enough to show she was "part of the organized structure and coordination of the drug point and that she worked with and assisted these other defendants in the possession with intent to distribute all types of drugs sold." After the jury rendered its verdict on January 5, 2016, Suanette filed a written Rule 29 motion for a judgment of acquittal which the trial judge denied without explanation.

On appeal, Suanette argues the government failed to prove she either conspired to distribute narcotics or aided and abetted the marijuana distribution.

### Conspiracy to distribute narcotics

"To convict someone of [drug-conspiracy], the government must prove beyond a reasonable doubt that he knew about and

voluntarily participated in the conspiracy, 'intending to commit the underlying substantive offense.'" United States v. Acosta-Colón, 741 F.3d 179, 190 (1st Cir. 2013) (quoting United States v. Ortiz de Jesús, 230 F.3d 1, 5 (1st Cir. 2000)). "[P]roof may come from direct evidence or circumstantial evidence, like inferences drawn 'from members' words and actions and from the interdependence of activities and persons involved.'" Id. (quoting Ortiz de Jesús, 230 F.3d at 5).

Suanette contends there was insufficient evidence to convict her of conspiracy because living with Carlitos did not mean she had joined the conspiracy, she was indifferent to the success of the drug selling enterprise, she had no interdependence with any members of the conspiracy, she didn't know what the others were doing, and there was no evidence she associated with anyone else in the conspiracy. The government responds there was sufficient evidence to convict Suanette of conspiring to traffic marijuana from Lopez's and Vega's testimony. The government says their testimony shows she was directly involved in dealing drugs and helping Carlitos and Vega with their drug sales. In our view, the government has the better argument. Two witnesses testified Suanette either resupplied or directly sold marijuana to them at one of the organization's drug hubs, that sometimes she was on her own, and sometimes she was with Carlitos, who had also been charged with the conspiracy to traffic drugs.

Suanette also makes a broad argument that the testimony from one CW contradicted the other because one testified she resupplied him with baggies of marijuana to sell and the other CW testified she did not resupply him, but she did sell directly to him either on her own or when she was with Carlitos. Suanette's argument doesn't help convince us there was insufficient evidence. When we view the testimony in the light most favorable to the prosecution (as we must, see Chan, 981 F.3d at 51), a rational jury could have easily concluded each CW simply had different interactions and experiences with her. CW Lopez and CW Vega observed her actions from their respective roles and positions within the organization. Each of their testimonies, on their own, could have been sufficient to convict her because they both observed her engage in the sale of marijuana: she delivered the inventory of marijuana for CW Vega to sell a few times a week, and she sold marijuana to CW Lopez by collecting the money while her husband handed the drugs to him.

Suanette also protests that "[m]ere association with a conspirator is not enough to prove beyond a reasonable doubt that [she] is also a co-conspirator." True, but CW Lopez's and CW Vega's testimony goes beyond mere association. Each of these witnesses testified that she either handed marijuana to them or a coconspirator standing nearby or took money from them while her husband handed the marijuana over to them. Their testimony

demonstrates she purposefully and willingly interacted with them. There is, therefore, sufficient evidence to sustain her conviction for the drug distribution conspiracy. See Acosta-Colón, 741 F.3d at 190-91.

### Aiding and abetting distribution of marijuana

Suanette states in her brief that there was insufficient evidence to convict her of aiding and abetting the distribution of marijuana but her entire argument seems to focus on her insistence that there was insufficient evidence to sustain her conviction for the conspiracy count. Giving her the benefit of the doubt, we briefly state that there certainly was sufficient evidence to find her guilty beyond a reasonable doubt of the aiding and abetting charge. The government argues the same evidence that convicted her of the conspiracy count is sufficient to prove beyond a reasonable doubt that she aided and abetted the distribution of marijuana. We agree.

To convict Suanette of aiding and abetting in the distribution of marijuana, the government needed to prove she "'associated h[er]self with the venture,' 'participated in [the venture] as something that [s]he wished to bring about,' and that [s]he 'sought by [her] actions to make the venture succeed.'" United States v. Monteiro, 871 F.3d 99, 109 (1st Cir. 2017) (quoting Negrón-Sostre, 790 F.3d at 311). The testimony from CW Lopez and CW Vega clearly shows she was more than merely present

for the interactions they had with her; she actively engaged in the distribution of marijuana when she resupplied CW Vega four times a week at the same time on each of those days and participated in the sale of marijuana to CW Lopez when she took the money he tendered when he bought from her and Carlitos. Cf. Negrón-Sostre, 790 F.3d at 311-12 (mere presence is insufficient to prove aiding and abetting possession with intent to distribute). We affirm her conviction for aiding and abetting the distribution of marijuana and move on to Juan's arguments about the lack of evidence supporting his convictions.

**Juan's convictions**

The testimony about Juan's actions included CWs and law enforcement agents. CW Ferrer testified about his experiences at Los Claveles, a tower of apartments where he often spent time with his cousin, Julio Alexis, and watched his cousin buy marijuana from the lobby. CW Ferrer also bought marijuana for others who were scared to go into this apartment building. Over time, CW Ferrer often helped during his cousin's shifts by giving customers the marijuana they bought while his cousin took the money. CW Ferrer testified he met Juan for the first time in January 2008, when he went to Juan's apartment with his cousin, who had just finished a shift and needed to do his "tally." (A tally, CW Ferrer explained, is when the seller returns the drug inventory he or she did not sell during a shift back to the runner along with the money

collected from sales throughout the shift.)  CW Ferrer watched his cousin record the number of baggies of marijuana and cocaine, vials of crack, and aluminum folds of heroin.

CW Ferrer also testified that he went to Villa Margarita in the summer of 2008 with his cousin when Juan asked the cousin to take the tally there.  When CW Ferrer and his cousin arrived at Villa Margarita, Joel called Juan using the walkie-talkie function on a cell phone to find out why Juan had not brought the tally over himself.  CW Ferrer testified the tally his cousin handed to Joel included money, marijuana, cocaine, crack vials, and aluminum packets of heroin.  CW Ferrer went back to Villa Margarita another time with his cousin, again on Juan's request.

CW Vega also testified about Juan's actions.  When Vega was working for the enterprise as a lookout at Villa Margarita in May 2008, he saw Juan several times.  On one occasion, other members of the enterprise handed Juan packages of heroin, marijuana, and crack cocaine, which Juan placed in the seat of the motorcycle he had arrived on before riding off in the direction of Los Claveles.  CW Vega also saw Juan at Los Claveles when Vega was there to buy drugs.  CW Vega testified he watched Juan get off an elevator and ask the man from whom CW Vega was buying to give him (Juan) the tally; the seller gave Juan money and Juan gave the seller a package with vials of crack.

Members of law enforcement also testified about Juan's actions. When Agent Evette Berrios Torres went to Villa Margarita in July 2008 as part of her investigation of drug trafficking and organized crime in that area, she observed Juan command the men he was with to cooperate with her and the other agents at the scene, leading by example when he walked up to her vehicle and placed his hands on the hood and ordering the others to do the same. According to Agent Berrios, they complied.

On appeal, Juan argues there was insufficient evidence to prove his guilt beyond a reasonable doubt and he identifies a lot of evidence against him as unreliable or not credible. He claims that the "main evidence" against him was CW Ferrer's testimony, which Juan brands as "[u]nreliable, uncorroborated, vague and scant." He also claims that CW Vega's testimony was vague and not credible. The government, for its part, argues that Juan's arguments boil down to his contention that the testimony of the CWs should not have been believed. We won't spend a boat load of time here examining Juan's claims because a defendant cannot win a sufficiency-of-the-evidence challenge by claiming (as Juan does) the witnesses against him were not credible. Our framework for reviewing this kind of challenge means we give the government the benefit of the doubt and resolve any questions of witness credibility against the defendant. United States v. Cruz-Ramos,

987 F.3d 27, 38 (1st Cir. 2021); United States v. Manor, 633 F.3d 11, 13 (1st Cir. 2011).

The government says there was sufficient evidence to convict Juan of conspiracy because it showed he was running the Los Claveles drug point for the drug trafficking organization. The government also argues that there was sufficient evidence to convict Juan of aiding and abetting drug trafficking because there was much eyewitness testimony that he managed the sale of several types of drugs from the Los Claveles drug point along with Joel and other members of the organization.

To the extent Juan is arguing that CW Ferrer's testimony was insufficient because it was uncorroborated, we can also head this off immediately because it is well-settled that "[t]estimony from even just one witness can support a conviction." Negrón-Sostre, 790 F.3d at 307 (quoting United States v. Alejandro-Montañez, 778 F.3d 352, 357 (1st Cir. 2015)). There was sufficient evidence on CW Ferrer's testimony alone to uphold Juan's conspiracy and aiding-and-abetting-the-distribution convictions. But more than one witness testified about Juan's involvement with the drug trafficking organization; CW Vega also testified about two specific instances of watching Juan receive packages of drugs or money in direct exchange for a package of drugs and Agent Berrios watched several men fall into line when Juan clearly had authority

to tell them what to do when she and her agents met them at Villa Margarita.

The testimony also demonstrates there was sufficient evidence to convict Juan of the conspiracy count because Juan clearly "knew about and voluntarily participated in the conspiracy, 'intending to commit the underlying substantive offense.'" Acosta-Colón, 741 F.3d at 190 (quoting Ortiz de Jesús, 230 F.3d at 5). The testimony summarized above also demonstrates there was sufficient evidence to convict Juan of the four aiding and abetting counts because Juan clearly "'associated himself with the venture,' 'participated in [the venture] as something that he wished to bring about,' and 'sought by his actions to make the venture succeed.'" Monteiro, 871 F.3d at 109 (brackets in original) (quoting Negrón-Sostre, 790 F.3d at 311).[36]

---

[36] Juan does not address his count of conviction for conspiracy to possess a firearm in furtherance of a drug trafficking crime, so he has waived any argument about the sufficiency of the evidence for that crime. See, e.g., Cruz-Ramos, 987 F.3d at 35 n.5 (citing Rodríguez, 659 F.3d at 175).

Juan also provides a laundry list of other evidence from trial and asserts, without any supporting case law whatsoever, why these pieces of evidence cannot support his conviction. We decline to address these assertions because he did not provide any developed argument about them. See Chan, 981 F.3d at 50 n.4 (citing Rodríguez, 659 F.3d at 175 ("It should go without saying that we deem waived claims not made or claims adverted to in a cursory fashion, unaccompanied by developed argument."); Holloway v. United States, 845 F.3d 487, 491 n.4 (1st Cir. 2017) (stating an argument was waived when party failed to provide any legal citations to support its argument)).

Finally, Juan writes a few lines suggesting his drug-related convictions should be dismissed because the indictment specified

- 103 -

Juan's convictions affirmed, we move on to the sentencing issues.

**SENTENCING**

Joel, Carlos, Juan, and Idalia all challenge the methods the trial judge used to calculate the drug quantities attributable to each of them when she determined their individual guidelines sentencing ranges ("GSRs") before imposing their individual sentences. Before tackling their respective arguments, we provide some basic sentencing principles which govern the way we consider their arguments.

Our overall task when we examine a sentence or, as here, the sentencing process, is to consider whether the sentence is reasonable. Typically, our reasonableness review "is bifurcated, requiring us to ensure that the sentence is both procedurally and substantively reasonable." United States v. Arsenault, 833 F.3d 24, 28 (1st Cir. 2016) (citing United States v. Mendez, 802 F.3d 93, 97 (1st Cir. 2015)). "We ordinarily review both procedural and substantive reasonableness [arguments] under a deferential

─────────────────

the location of his activities as within 1,000 feet of a public housing authority but Los Claveles is private property outside the purview of 18 U.S.C. § 860(a). The indictment actually charges him and the others with distribution "within 1000 feet of a playground in Los Claveles Housing Project and in around the Villa Margarita Ward . . . ," not a housing facility. Regardless, any argument or claim he intended to make on this basis is waived because it is perfunctory and undeveloped. See id.

abuse-of-discretion standard."  Id. (citing United States v.

Maisonet-González, 785 F.3d 757, 762 (1st Cir. 2015), cert. denied

sub nom. Maisonet v. United States, 136 S. Ct. 263 (2015)).

"However, when assessing procedural reasonableness, this

[c]ourt engages in a multifaceted abuse-of-discretion standard

whereby 'we afford de novo review to the sentencing court's

interpretation and application of the sentencing guidelines,

[examine] the court's factfinding for clear error, and evaluate

its judgment calls for abuse of discretion.'"  Id. (quoting United

States v. Ruiz-Huertas, 792 F.3d 223, 226 (1st. Cir. 2015)).  "And

we will find an abuse of discretion only when left with a definite

conviction that 'no reasonable person could agree with the judge's

decision.'"  McCullock, 991 F.3d at 317 (quoting Cruz-Ramos, 987

F.3d at 41).  One of the ways in which a district court can commit

a procedural error in sentencing is to improperly calculate the

GSR.  United States v. Lee, 892 F.3d 488, 491 (1st Cir. 2018).

### Drug Quantity
(Joel & Carlos)

Joel and Carlos[37] both challenge the trial judge's

findings of the drug quantities she used to calculate their GSR

---

[37] Joel was sentenced to 360 months on each of the following four counts:  conspiracy to distribute narcotics, aiding and abetting the distribution of heroin, aiding and abetting the distribution of crack cocaine, and aiding and abetting the distribution of powder cocaine; 120 months on the count for aiding and abetting the distribution of marijuana; and 240 months on the count for conspiracy to possess a firearm in furtherance of a drug

and determine their respective sentences.  Before delving into the arguments, we lay the groundwork for our review by summarizing Joel's and Carlos's objections and motions leading up to their sentencing hearings.

The presentencing report ("PSR") suggested a finding of 25,446.49 kg of marijuana for the three-year conspiracy (after converting the suggested quantities of the other drugs at play as instructed in U.S.S.G. § 2D1.1, App. Note 8(D)).  Before his sentencing hearing, Carlos filed an objection to the drug quantity included in the PSR, arguing this quantity was based on unreliable testimony from CW Vega.  According to Carlos, CW Vega testified to different drug amounts during cross-examination than he did during his direct testimony.  Carlos also argued that CW Vega's testimony regarding drug quantities only covered a portion of the three-year conspiracy and that Vega couldn't provide accurate quantities because his role shifted throughout the conspiracy from lookout to seller, meaning his testimony about quantities couldn't be extrapolated to calculate the total quantity for the entire three-

---

trafficking crime, all to be served concurrently.  Carlos, who was also convicted of all six counts charged, was sentenced to 324 months on each of the following counts:  conspiracy to distribute narcotics, and aiding and abetting the distribution of heroin, crack cocaine, and powder cocaine, respectively; 120 months on the count for aiding and abetting the distribution of marijuana, and 240 months on the count for conspiracy to possess a firearm in furtherance of a drug trafficking crime, all to be served concurrently.

year timespan of the charged conspiracy. Joel, for his part, also filed an objection to his own amended PSR, expressly adopting Carlos's arguments regarding extrapolation from CW Vega's testimony.

The trial judge overruled both objections, finding CW Vega's testimony reliable on the whole despite the occasional discrepancies in precise amounts. Addressing Carlos's and Joel's objections to using this testimony to extrapolate the total quantity for the length of the conspiracy, the judge stated the probation office used drug quantities from all four CWs and plausibly extrapolated from the testimonies to provide a conservative total quantity for sentencing purposes.

At the subsequent sentencing hearings, the judge attributed 25,446.49 kg of marijuana to Joel and to Carlos.[38] For Carlos, the judge calculated a total offense level of 41 with a criminal history category ("CHC") of I for a GSR of 324 to 405 months and ultimately sentenced him to 324 months. For Joel, the judge calculated a total offense level of 42 with a CHC of II for

---

[38] This quantity was the total quantity estimated in each PSR as attributable to the three-year conspiracy after the various controlled substances were converted to equivalent marijuana quantities as instructed in U.S.S.G. § 2D1.1(c), App. note 8(D), for purposes of determining the base offense level.

a GSR of 360 months to life and ultimately sentenced him to 360 months.[39]

On appeal, Joel and Carlos continue to press their argument that the only evidence of the drug quantities sold was testimony from CW Vega who, they say, did not provide reliable testimony because, throughout his testimony, he was inconsistent about how much he typically sold each shift he worked. Both also insist that the other CWs did not provide daily sales figures. Both appellants rely on United States v. Rivera-Maldonado, where we warned that "[t]he potential for grave error where one conclusory estimate serves as the multiplier for another . . . may undermine the reasonable reliability essential to a fair sentencing system." 194 F.3d 224, 233 (1st Cir. 1999) (remanding for resentencing because the drug quantity used to determine the base offense level was based on a pyramid of unreliable inferences). Carlos specifically argues that the trial judge's calculation of the drug quantity by multiplying small amounts seized across dozens of days of investigations in order to reach a daily sales figure is the kind of grave error we warned about in Rivera-Maldonado.

---

[39] Joel's counsel renewed the objection to the drug quantity during the sentencing hearing. Carlos's counsel did not lodge any additional objections during the sentencing hearing.

The government responds that the judge used a reasoned estimate of the drug quantity attributable to Joel and Carlos when she adopted the PSR's calculations because the probation office's calculation, while largely informed by CW Vega's testimony, was corroborated by other CWs' testimony regarding sales volumes. The government points out that, even if CW Vega's testimony had been entirely consistent between direct and cross-examination, the probation office's calculations of drug quantity were below the lowest quantity to which he testified. The government also emphasizes that the quantities calculated in the PSRs were conservative in other ways too, such as using only the estimated quantities of drugs sold at Villa Margarita and not adding quantities from sales at Los Claveles, considering the two-shift selling operation at Villa Margarita (as opposed to a single shift) as starting later in time than the testimony supported, halving the quantities sold during the day vs. night shifts, and using only sales figures for "slow" days (rather than the higher quantities supported by the testimonies for "busy" days).

"When making a drug quantity finding, the sentencing court's responsibility is to 'make reasonable estimates of drug quantities, provided they are supported by a preponderance of the evidence.'" Lee, 892 F.3d at 491 (quoting United States v. Mills, 710 F.3d 5, 15 (1st Cir. 2013)). "We review those estimates 'deferentially, reversing only for clear error.'" Id. (quoting

<u>Mills</u>, 710 F.3d at 15). "We will only find clear error when our review of the whole record 'forms a strong, unyielding belief that a mistake has been made.'" <u>Id.</u> at 491-92 (alteration adopted) (quoting <u>Cumpiano</u> v. <u>Banco Santander P.R.</u>, 902 F.2d 148, 152 (1st Cir. 1990)).

A defendant who is convicted of conspiracy to distribute controlled substances will be held responsible "not only for the drugs he actually handled but also for the full amount of drugs that he could reasonably have anticipated would be within the ambit of the conspiracy." <u>United States</u> v. <u>Correa-Alicea</u>, 585 F.3d 484, 489 (1st Cir. 2009) (quoting <u>United States</u> v. <u>Santos</u>, 357 F.3d 136, 140 (1st Cir. 2004)). Although the court "may rely on reasonable estimates and averages" to reach "its drug-quantity determinations", those estimates must possess "adequate indicia of reliability" and "demonstrate record support," <u>Rivera-Maldonado</u>, 194 F.3d at 228 (internal citations omitted); a "hunch or intuition" won't cut it, <u>Correa-Alicea</u>, 585 F.3d at 489 (quoting <u>Marrero-Ortiz</u>, 160 F.3d at 780). When we review the district court's factual finding as to drug quantity for clear error, we are looking for "whether the government presented sufficient reliable information to permit the court reasonably to conclude that [the appellants were] responsible for a quantity of drugs at least equal to the quantity threshold for the assigned base offense level." <u>Correa-Alicea</u>, 585 F.3d at 489 (quoting <u>United States</u> v.

Barnett, 989 F.2d 546, 553 (1st Cir. 1993)).  We have previously recognized that "an estimate of drug quantity may be unreliable if based on an extrapolation from too small a sample."  Id. (citing Rivera-Maldonado, 194 F.3d at 231 (holding a dozen controlled buys over a six-month period was not sufficiently reliable for estimating the overall drug quantity)).

The drug quantity the trial judge used to determine the applicable base offense level for Joel and Carlos was based on much more than a small sample of drugs seized by the government. The CWs testified at length about the operational details of their drug trafficking organization, including where the drugs were sold and how the sellers were organized first in one day shift but eventually evolved into a 24-hour operation with a day shift and a night shift.  CW Vega testified in detail about how much he sold on each day of the week, depending on the time of day.  While he did not testify to the same exact quantities when cross-examined, he provided the same general quantity range and, as the government points out, the PSR explicitly explains how it included conservative estimates for the length of time the sales were made 24 hours/day as opposed to 12 hours/day and the quantity of each drug sold per day.

The extrapolation of the drug quantities attributable to the entire length of the conspiracy was clearly based on information from CW Vega and informed by the testimony from other

CWs as well as testimony from the government's experts, and we have no concerns that there are any grave errors in the calculation of the total quantity attributed to the conspirators.  See Rivera-Maldonado, 194 F.3d at 233.  In our opinion, the judge's drug quantity finding was based on sufficiently reliable information and we have no reason to believe a mistake or clear error was made in the calculation of the total drug quantity.  See Correa-Alicea, 585 F.3d at 489.

### Juan

Juan raises different arguments than Joel and Carlos in his challenge to his 235-month sentence.[40]  Prior to the sentencing hearing, Juan asserted he should only be held responsible for the drug sales at Los Claveles and not the sales at Villa Margarita because, according to him, there was no evidence linking him to Villa Margarita.  He also asserted that there was no way for the court to determine the drug quantity for purposes of calculating his sentence because there was no testimony at trial about the quantity of the drugs sold at Los Claveles.  During his sentencing hearing, Juan relied on the written memorandum he'd already filed.

---

[40] Juan was sentenced to 235 months on his convictions for conspiracy to distribute narcotics, conspiracy to possess a firearm in furtherance of a drug trafficking crime, and aiding and abetting the distribution of powder cocaine, crack cocaine, and heroin.  Juan was also sentenced to 120 months on his conviction for aiding and abetting the distribution of marijuana, to be served concurrently with the sentence for the other counts of conviction.

The government argued the evidence at trial revealed Juan was a high-level runner for the organization who was clearly instructing other members of the conspiracy about where to go and what to sell, and that the Los Claveles and Villa Margarita drug points were part of the same operation with the same main operators, including Juan. On appeal, Juan contends his sentence was unreasonable for the same reasons he articulated in his sentencing memorandum.

As we previously stated, we review preserved sentencing arguments for abuse of discretion, reviewing the findings of fact for clear error and any conclusion regarding the governing sentencing laws de novo. Arsenault, 833 F.3d at 28. Juan argues that his sentence is procedurally unreasonable because the judge used the drug quantity evidence from sales at the "curve" to calculate his sentence. Juan says this evidence doesn't reflect his personal involvement in the conspiracy because he had allegedly worked as a runner at Los Claveles, not at the "curve," so the quantities for drug sales at the "curve" were not attributable to him in the absence of evidence connecting him to drug trafficking at the "curve."

Juan's right that "when a district court determines drug quantity for the purpose of sentencing a defendant convicted of participating in a drug trafficking conspiracy, the court is required to make an individualized finding as to drug amounts attributable to, or foreseeable by, that defendant." United States

v. Colon-Solis, 354 F.3d 101, 103 (1st Cir. 2004). But this is not the same thing as requiring that "the defendant must have personally handled the drugs for which he is held responsible," which we don't. Id. at 103 n.2 (citing U.S.S.G. § 1B1.3). "A defendant may be held responsible for drugs involved in his 'relevant conduct' [and] 'such conduct may include a defendant's own acts or the acts of others.'" Id. (first quoting U.S.S.G. § 1B1.3, then quoting United States v. Laboy, 351 F.3d 578, 578 (1st Cir. 2003)).

As the government points out, in a drug conspiracy, the quantities of drugs sold by others operating within the enterprise are attributable to a defendant as long as the sales were a reasonably foreseeable consequence of the enterprise. United States v. Ramírez-Negrón, 751 F.3d 42, 53 (1st Cir. 2014) ("A defendant may be held responsible only for drug quantities 'foreseeable to [that] individual.'" (quoting United States v. Correy, 570 F.3d 373, 380 (1st Cir. 2009))). "Foreseeability encompasses 'not only . . . the drugs the defendant actually handled but also . . . the full amount of drugs that he could reasonably have anticipated would be within the ambit of the conspiracy.'" Id. (brackets omitted) (quoting Santos, 357 F.3d at 140).

Both the Villa Margarita and Los Claveles drug points were part of the single conspiracy for which Juan was charged and

convicted; as summarized supra when we reviewed Juan's challenge to the sufficiency of the evidence to support his convictions, there was testimony to support Juan's movements and actions at and between both locations. It was therefore reasonably foreseeable that, while Juan primarily worked at Los Claveles, the sales at Villa Margarita would be both attributable and attributed to him. The trial judge did not abuse her discretion by using the drug quantities calculated from the sales at Villa Margarita when she calculated and imposed Juan's sentence.[41]

### Idalia

Idalia challenges the trial judge's attribution of her husband's crack sales to her. The evidence at trial showed Idalia directly sold vials of crack from her home, and at times completed the sales transactions when a customer was looking for her husband, Carlos. Idalia was sentenced to sixty months for her one count of conviction for aiding and abetting the possession with intent to distribute fifty grams or more of crack within 1,000 feet of a protected facility.

---

[41] Juan also states that his sentence was substantively unreasonable because some of the similarly situated codefendants (including other alleged drug runners) received more lenient sentences. Other than listing some of these codefendants' names, alleged role in the conspiracy, and ultimate sentence, Juan doesn't develop this argument. It is therefore waived. See Chan, 981 F.3d at 50 n.4.

Prior to her sentencing hearing, Idalia successfully challenged the PSR's recommendation that the court calculate her GSR using the amount of crack attributable to the entire conspiracy. The trial judge sustained her objection to the extent Idalia had not been convicted of the conspiracy charge but found the estimated amount of crack sold to CW Vega by Carlos was properly attributable to Idalia because her one count of conviction included aiding and abetting the distribution of crack cocaine. At the sentencing hearing, Idalia pressed her objection to the inclusion of the crack sold by Carlos in the court's finding of the amount of crack for which she was held responsible for sentencing purposes. She argued there was no indication CW Vega had bought crack from both her and Carlos at the same time -- always from either one or the other when the other was not present. In response, the trial judge noted CW Vega's testimony that he first bought from Idalia after she emerged from the house she shared with Carlos in response to Vega calling for Carlos and that he always bought from Carlos and Idalia from the yard of their house. The judge relied on U.S.S.G. § 1B1.3, which provides the relevant conduct for the determination of the GSR. See Sections 1B1.1, 1B1.2(b). Idalia was on the hook for:

> (1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or

- 116 -

enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were--
(i) within the scope of the jointly undertaken criminal activity,
(ii) in furtherance of that criminal activity, and
(iii) reasonably foreseeable in connection with that criminal activity;
that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense[.]

Section 1B1.3.

On appeal, Idalia continues her battle against the calculation of her GSR including the sales by Carlos to CW Vega during the time in which she also sold crack to Vega. She argues that her sentence is unreasonable as a result of this attribution, especially because the trial judge rounded up to two months of Carlos's sales to her when CW Vega's testimony indicated she might have only sold to him during a one-month period. The round up, according to Idalia, constitutes clear error on the part of the judge. The government responds that CW Vega's testimony reflected a two-month purchasing timeframe and argues that, as a matter of law, Carlos's sales to Vega during these two months were properly included in the total quantity attributed to Idalia for the purpose of calculating her GSR.

As we have previously stated, "[t]he district court's finding as to the amount of drugs reasonably foreseeable to [a defendant] need only be supported by a preponderance of the

evidence and need not be exact so long as the approximation represents a reasoned estimate." United States v. Ortiz-Torres, 449 F.3d 61, 79 (1st Cir. 2006) (citing Santos, 357 F.3d at 141). In addition, "[w]e will set aside a drug-quantity calculation only if clearly erroneous; if there are two reasonable views of the record, the district court's choice between the two cannot be considered clearly erroneous." Id. (citing Santos, 357 F.3d at 141).

Idalia, quoting United States v. Ortiz, 966 F.2d 707, 712 (1st Cir. 1992), points out that "the line that separates mere presence from culpable presence is a thin one, often difficult to plot." Indeed, we have also stated that "mere association between the principal and those accused of aiding and abetting is not sufficient to establish guilt; nor is mere presence at the scene and knowledge that a crime was to be committed sufficient to establish aiding and abetting." Id. (alteration adopted) (quoting United States v. Francomano, 554 F.2d 483, 486 (1st Cir. 1977)). However, these statements of black letter law related to the substantive charge of aiding and abetting won't help her here. There is no doubt she was on the hook for the crack sold by her partner at the same location and to the same person when it came to determining a reasonable sentence to impose for her aiding and abetting conviction. See U.S.S.G. § 1B1.3. The sentencing guidelines are clear, so the trial judge was not wrong to include

Carlos's crack sales to CW Vega during the time period the latter identified as also buying crack from Idalia when the trial judge calculated the total drug quantity attributable to Idalia.

Turning our attention to Idalia's argument that the trial judge clearly erred by using a two-month period to estimate the total quantity of crack attributable to Idalia for sentencing purposes, the government points out that Idalia did not specifically challenge the one- vs. two-month period during the sentencing proceedings. Because her challenge to the manner in which the trial judge calculated the total drug quantity attributable to her is well-preserved, we'll give her the benefit of the doubt about the preservation of this argument here for our review.

CW Vega first testified he bought crack from Idalia and Carlos for "a short while" starting in June 2006. When pressed by the prosecutor to be more specific about the time, he said "I would go to the drug point daily, so I would say about a month, two months" for a total of fifteen times after the first time he bought vials of crack from Idalia on the front porch. CW Vega also testified that he bought orange-capped vials of crack cocaine from Carlos -- in the yard of Carlos's house -- during "the same time of the two months" as when he bought from Idalia -- from the porch of the same house. The trial judge's decision to use the two-month period for calculating the GSR was not wrong, never mind

clearly wrong, because this time period and subsequent estimated quantity was supported by a preponderance of the evidence.  See Ortiz-Torres, 449 F.3d at 79.  Idalia's challenge to the procedural reasonableness of her sentence therefore fails.

## Crack:Powder
### (Carlos)

In addition to his drug quantity argument, Carlos also challenges the district court's denial of his request that it use a 1:1 ratio for crack cocaine:powder cocaine instead of the 18:1 ratio provided in the drug equivalency table in the 2016 U.S. Sentencing Guidelines, § 2D1.1, App. Note 8(D).[42]  The trial judge denied Carlos's motion because she was not convinced the ratio should be reduced at all in light of the § 3553 factors and "objectives of sentencing policy."  Before us, Carlos argues the judge should have used her discretion to apply a 1:1 ratio because the use of the smaller ratio would have had a big impact on his GSR and, according to him, there is increasing support for courts to vary from the 18:1 ratio in the guidelines.  Carlos also says the trial judge did not give an adequate explanation for her

---

[42] Pursuant to the drug equivalency table in the 2016 U.S.S.G. § 2D1.1, App. Note 8(D), the court is to convert 1 gram of cocaine base to 3,571 grams of marijuana but 1 gram of powder cocaine to 200 grams of marijuana when it calculates the total drug quantity attributable to a defendant.  Herein lies the 18:1 ratio.

refusal to use the requested 1:1 ratio.[43]  The government responds that the trial judge did indeed provide her reasons for denying Carlos's motion and was not required to vary from the ratio provided in the guidelines.  We agree and explain below why we leave Carlos's sentence as we have found it.

As part of the trial court's wide discretion in sentencing, the Supreme Court has acknowledged the "district courts' authority to vary from the crack cocaine Guidelines based on policy disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case."  Spears v. United States, 555 U.S. 261, 264 (2009) (emphasis in original).  Despite Carlos's insistence that the judge should have used a 1:1 ratio when determining the total drug quantity here, there is no question that the judge had the discretion to stick to the 18:1 ratio in the guidelines and did not abuse her discretion by deciding not to vary from the applicable drug equivalency table.  See id.  While there is an acknowledged disparity in sentencing created by such a divergent conversion scheme for crack vs. powder cocaine, Dorsey v. United

---

[43] The government says Carlos has not preserved this argument for our review because Carlos's ratio-based arguments to the trial judge during the sentencing phase did not frame this issue in terms of procedural unreasonableness.  We disagree and proceed with our standard abuse of discretion lens of review because we don't see a pivot in the framing of Carlos's argument in his brief before us.

States, 567 U.S. 260, 266, 268 (2012), we need not and do not get into that policy controversy here, despite Carlos's invitation to follow a couple of district court judges who have chosen to vary from the drug equivalency ratios captured in the sentencing guidelines. The trial judge did not abuse her discretion when she denied Carlos's motion to use a 1:1 crack to powder cocaine ratio.

## WRAP UP

For the reasons we stated and explained for each of the issues discussed above, we affirm all the defendants' convictions and sentences.